### FOR THE

## STATE OF MICHIGAN,

### In January Term, 1843.

#### PRESENT:

HON. GEORGE MORELL, CHIEF JUSTICE,
HON. EPAPHRODITUS RANSOM,
HON. CHARLES W. WHIPPLE,  } JUSTICES.
HON. ALPHEUS FELCH,

---

## FITCH & GILBERT *v.* NEWBERRY & GOODELL.

Plaintiffs, by their agents, shipped goods at Port Kent, on Lake Champlain, consign-
ed to them at Marshall, Michigan, care of H. C. & Co. Detroit, by the New York
and Michigan Line, who were common carriers, and with whom they had previously
contracted for the transportation of the goods to Detroit, and paid the freight in
advance.  During their transit, and before they reached Buffalo, the goods came
into the possession of carriers doing business under the name of the Merchants'
Line, without the knowledge or assent of the plaintiffs, and were by them trans-
ported to Detroit, consigned by H. P. & Co. of Buffalo, to the care of the defendants,
and delivered to the defendants, who were personally ignorant of the manner in
which they came into the possession of the Merchants' Line, and of the contract
of the plaintiffs with the New York and Michigan Line, although they and also H.
P. & Co. were agents for and part owners in the Merchants' Line.  The defendants
being warehousemen and forwarders, received the goods and advanced the freight
upon them from Troy, N. Y. to Detroit.  On demand of the goods by the plain-
tiffs, the defendants refused to deliver them until the freight advanced by them, and
their charges for receiving and storing the goods, were paid; claiming a lien upon
the goods for such freight and charges.  In replevin brought for the goods, *Held,*

VOL. I.                    1

that the plaintiffs were entitled to the possession of the goods without payment to the defendants of such freight and charges, and that the defendants had no lien upon the goods for the same.

A common carrier is bound to receive and carry goods, only when offered for carriage by their owner or his authorised agent, and then only upon payment for the carriage in advance, if required.

If a common carrier obtains possession of goods wrongfully, or without the consent of the owner, express or implied, and, on demand, refuse to deliver them to the owner, such owner may bring replevin for the goods, or trover for their value.

To justify a lien upon goods for their freight, the relation of debtor and creditor must exist between their owner and the carrier, so that an action at law might be maintained for the payment of the debt sought to be enforced by the lien.

THIS was an action of replevin for the taking and detention of sixty-five kegs of nails, one box of goods, and one barrel of apples, tried in the Circuit Court for the county of Wayne, before GEO. MORELL, Presiding Judge, at the November Term, 1841. The taking and detention of the property, were admitted by the pleadings. The facts in issue were found by a special verdict, which was certified to this Court for its opinion upon the questions of law arising therefrom. The facts found, out of which the question decided by this Court arises, are the following:

The goods and chattels described in the declaration, were the property of the plaintiffs. They contracted with the New York and Michigan Line for the transportation of the nails, to be delivered to Hutchinson, Campbell & Co. Detroit, for $1 per hundred pounds, payable in Michigan funds, and paid the freight in advance to the proprietors of the line at Detroit. The nails were shipped, by the agents of the plaintiffs, at Port Kent, on Lake Champlain, July 18, 1838, by the New York and Michigan Line to Detroit, M. consigned to the plaintiffs at Marshall, M. care of Hutchinson, Campbell & Co. Detroit, and on such

shipment the following bill of lading was given, signed
by the master of the sloop Lafayette:

|  |  |
|---|---|
| | Shipped, in good order and |
| *F. & G. Marshall, Michigan.* | well conditioned, by Keese- |
| *Care of* | ville Mf. Co. on board the |
| *J. Movius & Co. Ypsilanti,* | sloop called the Lafayette, |
| *H. Campbell & Co. Detroit.* | whereof C. P. Allen is mas- |
| *New York & Michigan Line.* | ter for this voyage, now ly- |
| *Care of* | ing at the port of Port Kent, |
| *Eddy & Bascomb, Whitehall.* | and bound for Whitehall— |

To say: Sixty-five kegs of

nails of 100 lbs. each,                          6,500 lbs.

Tare,                390

6,890

at 16 9-10 cts. per hund. delivered in Alba-
ny, is                                        $11.60
being marked and numbered as in the margin, and are to
be delivered in the like good order and well conditioned,
at the port of Albany, (the danger of the seas only ex-
cepted,) unto the agents of the New York and Michigan
Line, or to their assigns; freight for the said 65 kegs be-
ing paid to Albany by Messrs. Eddy & Bascomb, $11.60.

In witness whereof, the master, as purser of the said
vessel, hath affirmed to three bills of lading all of this
tenor and date, one of which being accomplished, the
others to stand void.   Dated at Port Kent, the 18th day
of July, 1838.                          *Charles P. Allen.*

The several kegs of nails, were each marked "F. &
G. Marshall, Michigan, care of Hutchinson, Campbell &
Co. Detroit."   Robert Hunter & Co. at Albany, and
Hunter, Palmer & Co. at Buffalo, were partners in the
business of transportation and forwarding between Alba-
ny, N. Y. and Detroit, M. and they, together with the

defendants, who were also forwarding and commission merchants at Detroit, were the owners, and each at their respective places of business, agents of the Merchants' Line. Hunter, Palmer & Co. received the nails at Buffalo from one of the canal boats of the Merchants' Line, accompanied by a bill of lading from Robert Hunter & Co. as consignors, and advanced the freight and charges upon them from Troy to Buffalo. They then shipped them to Detroit on board a steamboat belonging to the Merchants' Line, consigning them, by another bill of lading, to the care of the defendants, who received them Aug. 11, 1838, and paid the freight and charges on them from Troy to Detroit, amounting to the sum of $85.63. The box of goods and barrel, were shipped at a date subsequent to the shipment of the nails, from Whitesboro', N. Y. by the same line, upon the same terms, to the care of Hutchinson Campbell & Co. marked " Fitch & Gilbert, Marshall, Michigan; care of Hutchinson, Campbell & Co. Detroit; New York and Michigan Line ;" and the freight on them was also paid by the plaintiffs in advance. They were received in the warehouse of the defendants at Detroit, Oct. 26, 1838, and, as appeared by their books, they paid the freight and charges upon them to Detroit, amounting to $3.83. The defendants had no knowledge of the contract made by the plaintiffs with the New York and Michigan Line for the transportation of the goods, or of the payment of the freight to said line, until in the fall of 1838, after their receipt by the defendants, when the plaintiffs demanded delivery of the goods, and informed them of such contract and payment. They refused to deliver the goods either to the plaintiffs or at the warehouse of Hutchinson, Campbell & Co. until the freight and charges of transportation thereon, advanced by them, amounting to $89.46, (and exceeding the cost of transportation under the contract between the plaintiffs and the New York and

Michigan Line,) and also their charges for wharfage and storage of the goods, amounting to $16.53, were paid, claiming a lien upon the goods for such advances and charges. Whereupon, the plaintiffs sued out this writ of replevin.

*H. H. Emmons*, for the plaintiffs.

*Geo. C. Bates*, for the defendants.

RANSOM, J.   Upon the facts found in the special verdict, several questions were raised, but the most important, and the only one which we deem it necessary to consider, is, whether the defendants had acquired a *lien* upon the goods, which they could enforce, even against the owners, the plaintiffs in this case.

On the part of the defendants, it is contended that a common carrier who receives goods for carriage and transports them, may detain them by virtue of his lien, for freight, even against the owner, in case the freight has been earned without *fraud* or *collusion* on his part; that, if goods be *stolen*, or otherwise *tortiously obtained* from the legal *owner*, at New York or elsewhere, and carried by a transportation line from thence to Detroit, *without a knowledge of the theft* on the part of the carrier, he would be entitled to a *lien* for freight, even against the owner.   This doctrine is sought to be maintained by the defendants' counsel, on several grounds :  1.  He insists that a common carrier is bound to receive goods which are offered for transportation, and to carry them ; that it is not a matter of choice whether he will receive and carry them or not; that he is liable to prosecution if he refuses.   2.  That a common carrier is not only bound to receive and transport goods that are offered, but he is liable for their *loss*, in *all cases*, except by the *act* of *God* and public enemies ; and the same rule, he insists, applies to warehousemen and

forwarders. 3. That the duties and obligations of common carriers and innkeepers, are, in all respects, analogous; and an innkeeper is bound to receive and entertain guests, and to account for a loss of their baggage while under his care. 4. That a common carrier, being bound by law to accept goods offered him for carrying, and being responsible for their safe delivery in all cases, except when prevented by the act of God or public enemies, is entitled to a *lien* for their freight, against all persons, including even the owner, when the goods were tortiously obtained from him; that he is not bound to enquire into the title of the person who delivers them: and such *lien* exists, although there be a special agreement for the price of carriage. 5. That the master is not bound (nor his agent for him) to deliver any part of a cargo until the freight and other charges are paid.

But for the plaintiffs it is contended: 1. That *liens* are only known or admitted in cases where the relation of *debtor* and *creditor* exists, so that a suit at law may be maintained for the debt which gives rise to the *lien;* that a *lien* is a *mere right* to detain goods until *some charge* against the owner be satisfied. 2. That the defendants obtained possession of the goods without authority from the owners, either express or implied; that no legal privity exists between the parties, and therefore the relation of debtor and creditor does not exist between the defendants or their principals and the plaintiffs, and no action could be maintained by either against them for the freight, or any part of it. 3. They contend further, that, even if the defendants *lawfully* received the goods from the original carriers of the plaintiffs, the New York and Michigan Line, they did so as *their* agents and servants, and were bound by their agreement with the plaintiffs; that their contract of affreightment is incomplete, and therefore no freight is due.

That common carriers are bound to receive goods which

are offered, by the owners or their agents for transportation and to carry them for a just compensation, upon the routes which they navigate, or over which they convey goods in the prosecution of their business, is too well settled to require discussion, although this general proposition is subject to some qualifications.

Chancellor *Kent* says, 2 Kent's Com. 598 : " Common carriers undertake generally, and for all people indifferently, to convey goods and deliver them at a place appointed, for hire, and with or without a special agreement as to price.   They consist of inland carriers by land or water, and carriers by sea; and as they hold themselves out to the world as common carriers, for a reasonable compensation, they assume to do, and are bound to do what is required of them in the course of their employment, *if they have the requisite conveniences to carry, and are offered a reasonable or customary price;* and if they refuse without some just ground, they are liable to an action."

The books, English and American, are filled with strong cases affirming this doctrine.   *See* 2 Show. R. 332 ; 5 T. R. 143 ; 4 B. & Ald. 32 ; 1 Pick. R. 50, and numerous other cases, and the elementary writers *passim.*

That common carriers are responsible for the safe conveyance and delivery of the goods committed to them for carriage, is just as conclusively settled as that they are bound to receive and carry them.   A common carrier is said to be in the nature of an insurer, and is answerable for accidents and thefts, and even for a loss by robbery. He is answerable for all losses which do not fall within the excepted cases of the act of God, or inevitable accident without the intervention of man, and public enemies. 2 Kent's Com. 597 ; *Colt* v. *McMechen*, 6 Johns. R. 160. This doctrine is sustained by a series of decisions running back through a period of more than a century and a half. *Proprietors Trent Navigation* v. *Wood*, 3 Esp. R. 127 ;

*Dale* v. *Hall*, 1 Wils. 288 ; *Forward* v. *Pittard*, 1 T. R. 33 ; *Hyde* v. *Trent Navigation Company*, 5 T. R. 389.

Another position taken by the defendants' counsel, that the duties of common carriers and innkeepers are analogous, may be admitted. As a general proposition it cannot be denied. Upon the obligations and liabilities imposed on common carriers, for the transportation, safe custody and delivery of goods, the counsel for the defendants base a corresponding right to compensation for such transportation and delivery, and a *lien* on the goods for its payment.

If, as contended for by the defendants, a carrier is bound to receive and carry all goods offered for transportation, without the right of enquiring into the title or authority of the person offering them, then clearly he should be entitled to a *lien*, even against the owner, upon the goods, until he is paid for the labor he may bestow in their carriage.

Let us now enquire whether such is the law.

The doctrine is certainly opposed to all the analogies of the law, and it seems to me to every principle of common justice.

The only adjudged case I have been able to find, which favors it, is *Yorke* v. *Grenaugh*, 2 Ld. Raym. 866. That was replevin for a gelding. The defendant, who was an innkeeper, received the horse from a stranger who had stolen him. On demand being made for the horse, by the owner, the defendant, who was ignorant of the theft when he received him, refused to deliver him up until paid for his keeping, insisting on his right of lien. The Court held it reasonable that he should have a remedy for payment, which was by retainer; and that he was not obliged to consider who was the owner of the horse, but whether he who brought him was his guest. And *Holt*, C. J. cited the case of the *Exeter carrier*, which he thus stated :

Fitch & Gilbert *v.* Newberry & Goodell.

Where A. stole goods, and delivered them to the *Exeter* carrier to be carried to *Exeter*, the owner finding the goods in the possession of the carrier, demanded them of him. The carrier refused to deliver them, without being first paid for the carriage.   The owner brought trover for his goods, and it was adjudged that the defendant might detain them for the carriage, on the ground that the carrier was obliged to receive and carry them.   *Powell*, J. denied the authority of the *Exeter* case, but concurred with C. J. *Holt* in the decision of the case then under consideration. There is an obvious ground of distinction between the cases of *carrying goods* by a common carrier, and the furnishing *keeping* for a horse by an innkeeper.   In the latter case, it is equally for the *benefit* of the owner to have his horse fed by the innkeeper, in whose custody he is placed, whether left by a thief or by himself or agent; in either case, food is necessary for the preservation of his horse, and the innkeeper confers a benefit upon the owner by feeding him.   But can it be said that a carrier confers a benefit on the owner of goods, by carrying them to a place, where, perhaps, he never designed and does not wish them to go ?  Or, as in this case, is the owner of goods benefitted by having them taken and transported by *one* transportation line, at their own price, when he had already hired and paid *another* to carry them at a *less* price ? This distinction does not, however, at all affect the determination of the case before us ; we place it entirely upon other grounds.

The case of *Brown* v. *Walters*, 14 E. C. L. R. 424, was cited to show that a carrier was not bound to enquire into the title of a person offering goods for carriage.   In that case the plaintiff bought two horses of defendant, which had been previously placed in the possession of one Boost, a livery stable keeper, for *feeding* and *training*.   When the plaintiff, after the purchase, applied to Boost for the horses,

he refused to deliver them till paid for keeping and train-
ing, which the plaintiff paid, amounting to £130, and then
brought assumpsit against the defendant for the money.
He was allowed to recover on the ground that Boost had
a valid lien upon the horses, and that the sale by defen-
dant to the plaintiff created such a privity between them,
as authorised the plaintiff to discharge the lien and resort
to the defendant for repayment.

The decision of that case, it is seen, does not rest at all
upon the ground contended for here by the defendants.

Several elementary authorities are also cited by defen-
dants' counsel, in support of the doctrine assumed, but
they are found, in every instance, to refer to the case of
*Yorke* v. *Grenaugh*, 2 Ld. Raym. and of course do not go
far to fortify the position taken in this case; but leave it
still resting upon the authority of that decision alone.

All the other cases, in which the general proposition is
laid down that common carriers are bound to receive goods
offered for carriage, are evidently based upon the suppo-
sition that the goods are there offered by their owners or
their authorised agents; and that, if in any way they ac-
quire possession of property without consent of the owner,
express or implied, they, like all other persons, may be
compelled to restore it to such owner, or pay him for its
value.    And that the doctrine of *caveat emptor* applies,
with the same force, to that class of persons as to others,
is manifest, I think, from an examination of authorities.

The obligation of a common carrier to receive and car-
ry all goods offered, is qualified by several conditions,
which he has a right to insist upon before receiving them.
1. That the person offering the goods has authority to do
so.   2. That a just compensation, or the usual price, be
tendered for the carriage.    And 3. That although the *own-
er*, or his agent, offer goods for carriage and tender pay-
ment for the freight in advance, still he is not bound to re-

ceive them, unless he have the requisite convenience to carry them.

In an action brought against a carrier for refusing to receive and carry *goods*, would it not constitute a valid defence that the plaintiff had stolen them, although, at the time of offering, the carrier may not have known they had been stolen?

In Story on Bail. § 582, it is laid down that a carrier is excused for *non-delivery* of goods to the consignee, when they are demanded, or taken from his possession, by some person having a superior title to the property. And, again, where the adverse title is made known to the carrier, if he is forbidden to deliver the goods to any other person, he acts at his peril; and if the adverse title is well founded and he resists it, he is liable to an action for the recovery of the goods.

If, then, the owner could reclaim the goods in the hands of the carrier, *after* their delivery to him, and that would excuse a *non-delivery* to the depositor, it is clear that he would be justified in refusing to *receive* them from one having a wrongful possession, although at the time of such refusal, he might not know the manner in which they had been obtained.

So, a carrier is in all cases entitled to demand the price of carriage before he receives the goods, and, if not paid, he may refuse to take charge of them. Story on Bail. § 586; 5 Barn. & Ald. 353; 4 Id. 32; 3 Bos. & Pull. 48; and Whit. on Liens, 92.

If, then, a common carrier may demand payment for carriage in advance, and if he may reject goods offered by a wrong doer, or by one having no authority to do so, is he not bound to take care that the person from whom he receives them has authority to place them in his custody?

In Story on Bail. § 585, it is said: A carrier having

once acquired the *lawful* possession of goods for the purpose of carriage, is not bound to restore them to the *owner again*, unless his due remuneration be paid ; evidently presupposing the goods to have been delivered to him by the owner; and cites 9 Johns. 17 ; 3 Johns. Cases, 9.   In *Lemprier* v. *Pasley*, 2 T. R. 485, it was held that goods, wrongfully delivered to the person claiming them, who paid freight and other charges, could not be detained for those expenses against the rightful owner.   In 2 Kent's Com. 638, it is laid down that possession is necessary to create the lien, but though there be possession of goods, a lien cannot be acquired, when the party came to that possession wrongfully.   So, if the party came to the possession of goods *without due authority*, he cannot set up a *lien* against the owner.   2 Kent's Com. 638 ; 5 T. R. 604 ; 4 Esp. R. 174 ; 7 East. 5.   In *Buskirk* v. *Purington*, 2 Hall R. 561, property was sold upon a condition ; the buyer failed to comply with the condition, but shipped the goods on board the vessel of the defendants.   The owner claimed the goods, demanded them, and on defendants' refusal to deliver them, brought trover for their value.   The defendants insisted on their right of lien for the freight, but the plaintiff was allowed to recover.

In *Salters* v. *Everett*, 20 Wend. 275, the master of a vessel, with whom the defendant in error shipped goods from New Orleans to New York, during the voyage made a new bill of lading in his own name as owner.   The goods at New York were sold to the plaintiff in error, who was ignorant of the shipmaster's fraud.   The owner, (the defendant in error,) sued the purchaser for their value, or return.   Senator *Verplanck*, in the opinion which he delivered in the Court of Errors, held this doctrine : " The universal and fundamental principle of our law of personal property, is, that no man can be divested of his property without his own consent ; and, consequently, that

Fitch & Gilbert *v.* Newberry & Goodell.

even the honest purchaser, under a defective title, cannot hold against the true proprietor." And again, "there is no case to be found, or any reason or analogy any where suggested in the books, which would go to show that the *real owner* could be concluded by a bill of lading not given by himself, but by some third person, *erroneously* or *fraudulently.*" Id. 281. "If the owner lose his property, or is robbed of it, or it is sold, or pledged without his consent, by one who has only a temporary right to its use, by hiring or otherwise ; or a *qualified possession* of it, for a specific purpose, as for transportation, or for work to be performed upon it, the owner can follow and reclaim it in the hands of any person, however innocent. Id. 282.

In *The Anne,* 1 Mason C. C. R. 512, persons not authorised by the owner took command of a vessel, and carried her out of the regular course of the voyage, and employed a pilot to take her into port, and he sought to enforce his lien on the vessel for pilotage. In deciding that case the Court say : "It cannot be maintained, upon any acknowledged principles of law, that mere wrong doers, or usurpers of the command of the ship, not acknowledged or appointed by the owner, can create a lien on the ship, or personally bind the owner, by a contract which they may choose to make, whether it be beneficial to him or not."

In *Greenway* v. *Fisher,* 1 C. & P. 190 ; (11 E. C. L. R. 362,) it was said, that if goods be placed in the hands of a common carrier without the consent of the owner, and while he has them in possession, they be demanded and he refuse to deliver them, trover lies at the suit of the owner. In *Hoffman* v. *Carrow,* 22 Wend. 318, the Court say : "The doctrine of our decision is, that the original and true owner of moveable property, who has not, by his own act or assent, given a color of title or an apparent right of sale to another, may recover its value from any

one having it in possession, and refusing to deliver it up to him."

If it be said for the defendants that Allen, the master of the vessel on which the goods were originally shipped, or Eddy & Bascomb, the wharfingers and forwarders to whose care at Whitehall they were consigned, delivered them to the defendants, or to those from whom they received them; it may be replied, that if such were the fact, it would not affect the rights of the plaintiffs, or the liabilities of the defendants, under the facts found by the special verdict in this case.

The jury have found that the plaintiffs contracted with the New York and Michigan Line, to transport their goods to Detroit, and paid them the stipulated price for the carriage, in advance.   The only power over the goods which that line derived from their contract with the plaintiffs, was, to safely carry and deliver them at the place of consignment.   They had no authority to transfer them to any other line, and make the plaintiffs chargeable for the freight. And the defendants, under such a transfer, could acquire no right to compensation for freight as against the plaintiffs.

Nor had Eddy & Bascomb, from any fact appearing in the case, any authority to forward the goods, from Whitehall, by any conveyance other than that which the plaintiffs had directed, and which appeared upon the bill of lading that accompanied the goods.   A special authority must be strictly pursued; and whoever deals with an agent, constituted for a special purpose, deals at his peril, when the agent passes the precise limits of his power.   2 Kent's Com. 631.   No one can transfer to another a better title than he has himself, or a greater interest in personal property, than he or the person for whom he acts, possesses.   *Hoffman* v. *Carrow*, before cited.

To create a *lien*, it is necessary that the party vesting it,

Fitch & Gilbert ... Newberry & Goodell.

should have the power to do so. ¿A person can neither acquire a lien by his own wrongful act, nor can he retain one, when he obtains possession of goods without the consent of the owner, express or implied.¡ 5 T. R. 606 ; 1 Saund. Pl. & Ev. 326 ; 2 Stark. Ev. 360; *Andrew* v. *Dietrich*, 14 Wend. 31.

It is quite clear that from no delivery made of the goods in question, by the original carriers, to the Merchants' Line, can any contract be implied that the plaintiffs would pay them for the freight, and thus lay the foundation for the lien claimed.

But if it be admitted that the owners or agents of the New York and Michigan Line, delivered the plaintiffs' goods to the defendants, or to those for whom they acted, they must be presumed to have received them as the agents of that line, and to have transported them from Albany to Detroit, for and on account of that line ; and they, consequently, can resort to it alone for compensation.   If the defendants are the agents of the New York and Michigan Line, they are bound by the contract of affreightment which that line made, and to entitle them to freight, (had it not been paid in advance,) they should show that contract strictly and fully performed, by a delivery of the goods to the consignees named in the contract.   It is not sufficient that the goods arrive at the port of destination, but there must be a delivery of them to perfect the right to freight.   Ab. on Sh. 273.   It is a general and an acknowledged rule, that the voyage must be performed according to the contract, before the ship owner or master can demand his freight.   Conveyance and delivery of the cargo, are conditions precedent, and must be fulfilled.   A partial performance is not sufficient, unless delivery be dispensed with, or prevented by the owner. *Palmer* v. *Lorrillard*, 16 Johns. R. 356.

If the goods came to the hands of the defendants or

their principals, *without* the agency of those who control the New York and Michigan Line, *with* or *without* fraud, as by finding them in a storehouse, or on a wharf at Whitehall, Albany, Buffalo or elsewhere, it would not vary the case.

If goods came to the possession of a person by finding, and he has been at trouble and expense about them, he has a *lien* upon the goods for compensation, *in one case only*, and that is the case of goods lost at sea; *then* there is a lien for salvage.    This lien is allowed upon principles of commercial necessity, and is thought to stand upon peculiar grounds of maritime policy, and does not apply to cases of finding upon land.    2 Mason R. 88; 2 Kent's Com. 635, and numerous cases there cited.

But it is insisted by the plaintiffs that a *lien* can *only* be created when the relation of *debtor* and *creditor* exists between the parties.

A lien is defined to be a *tie, hold,* or *security* upon goods or other things, which a man has in his custody, till he is *paid what is due him.*    2 Pet. Dig. 692.

In the case of the *United States* v. *Barney,* it was held that a *lien* cannot exist against the Government; for liens are only known or admitted, in cases where the relation of *debtor* and *creditor* exists, so as to maintain a suit at law for the debt or duty which gives rise to the lien, in case the pledge be destroyed, or the possession lost.    An innkeeper cannot, therefore, upon the ground of a lien, justify the arrest and detention of the horses employed in the transportation of the public mails.    2 Pet. Dig. 693; Hall's Law Jour. 128.    In *Oppenheim* v. *Russell,* 3 B. & P. 49, Justice *Heath* says: " There is a certain privity of contract, between the consignor of goods and the carrier, and it is evident that there is this privity of contract from this consideration, that if the consignee cannot be found, or refuse to receive the goods, the carrier may come upon

the consignor for the carriage of the goods, which he could not do, unless there was a privity of contract between them." Is not the principle, decided in these cases, perfectly conclusive of the rights of the parties to this suit? It seems to me to be a proposition too plain to be controverted. That one man cannot, *by his own act,* make another his debtor, *without his consent,* will not be questioned. Consequently, it is not sufficient to create the relation of *debtor and creditor, that the plaintiff should have rendered services to the defendant, without also showing that the defendant assented to the services, and expressly or impliedly agreed to remunerate the plaintiff for them.* *Bartholomew* v. *Jackson,* 20 John. 28, is a strong case upon this point. The action was assumpsit, for removing a stack of wheat, without the knowledge of the defendant, to prevent its being burned. ·- The Court, in their decision of the case, adopt this language: "The plaintiff performed the service without the privity or request of the defendant, and there was, in fact, no promise, express or implied." *Everts* v. *Adams,* 12 John. 352, where the plaintiff furnished medicines for a town pauper, and sought to charge the overseers of the poor, and *Dunbar* v. *Williams,* 10 Johns. 249, where the plaintiff provided medicines to defendant's slave, without the knowledge of the owner, and numerous kindred cases, are to the same effect.

*Schmaling* v. *Thomlinson,* 6 Taunt. 147 ; (1 E. C. L. R. 336,) bears directly upon the question involved in this case. The action was for commission, work and labor, and money paid for shipping and forwarding the goods of the defendants from London to Amsterdam. The defendants employed Aldibert, Becker & Co. to perform the business, and they employed the plaintiffs, who had no communication with, or knowledge of the defendants. The plaintiffs forwarded the goods as directed. The Court decided there was no privity between the plaintiffs and defendants ;

that the defendants looked to Aldibert, Becker & Co. for the performance of their business, and Aldibert, Becker & Co. and they only, had a right to look to the defendants for payment. There the forwarder delivered the goods and sued for the carriage, &c. Here the defendants *refused* to deliver the goods, and insisted on their right to a *lien*. The principle involved, however, is the same in both cases, if it be admitted that there must be a *debt* to sustain a *lien*.

Finally, on a full and careful consideration of this case, we arrive at the following conclusions:

1. That a common carrier is bound to receive and carry goods, only, when offered for carriage by their owner or his authorised agent, and *then* only upon payment for the carriage in advance, if required.

2. If a common carrier obtains the possession of goods wrongfully, or without the *consent* of the owner, express or implied, and, on demand, refuses to deliver them to the owner, such owner may bring replevin for the goods, or trover for their value.

3. To justify a *lien* upon goods for their freight, the relation of debtor and creditor must exist between the owner and the carrier, so that an action at law might be maintained for the payment of the debt, sought to be enforced by the *lien*.

The facts set forth in the special verdict found in this case, do not bring it within the principles which justify the *lien* claimed by the defendants, and, therefore, judgment for the plaintiffs must be entered upon the verdict, for their damages for the detention of the goods replevied, and for their costs.