[No. 32888. *En Banc.* November 10, 1955.]

F. KEMPER FREEMAN, *Appellant*, v. I. G. NAVARRE *et al.*, *Defendants*, THE RIC-WIL COMPANY, *Respondent.*[1]

[1]Reported in 289 P. (2d) 1015.

*Bogle, Bogle & Gates* and *Thomas L. Morrow,* for appellant.

*Holman, Mickelwait, Marion, Black & Perkins, J. Paul Coie,* and *Boardman W. Brown,* for respondent.

FINLEY, J.—This is an action for damages based upon alleged defects in an underground steam heat distribution system installed at the Bellevue Shopping Square at Bellevue, Washington. Appellant, together with certain predecessors in interest, developed the shopping center and is the owner of the real property involved. He employed Bliss Moore, Jr., as general architect for the development of the shopping center. With appellant's approval, the architect employed Lincoln Bouillon & Associates as consultant engineers respecting heating and ventilation problems. The latter recommended a central underground steam heat distribution system and specified the use of presealed insulated pipe units, designed and manufactured by The Ric-Wil Company. Navarre Plumbing & Heating Company was the contracting firm which installed the heating system.

Installation of the underground steam heat distribution system was completed in June, 1947. Commencing in January, 1949, numerous leaks or defects developed in the underground pipes or conduits. All of the defendants participated in efforts to remedy and repair the system until some time in January, 1951, when such efforts were abandoned.

The complaint alleged that the system would have to be replaced at considerable cost; that appellant sustained substantial damages in attempting to operate the system and in the efforts to repair it. The heating contractor, the engineering firm, and the manufacturer were joined as defendants for the reason that "plaintiff is in doubt as to whether the defendants are liable to plaintiff, jointly, severally, or, in the alternative, for the damages and as to the extent of the liability of the respective defendants." At the end of the plaintiff's case, a challenge was interposed as to the sufficiency of the evidence to present a cause of action. The Ric-Wil Company was dismissed on the ground of lack of privity of contract between it and the plaintiff. The question of liability of the engineer and the heating contractor was submitted to a jury, which returned a verdict in favor of these defendants. There is no appeal from the judgment entered on the verdict of the jury. The instant appeal is taken from the order dismissing The Ric-Wil Company, as indicated above, at the end of the plaintiff's case. It follows that the only question presented here is whether the appellant, the ultimate user, can recover from respondent, the manufacturer.

In view of the challenge to the sufficiency of the evidence, we are required to interpret the evidence in this case in the light most favorable to the appellant. *Olsen v. White*, 37 Wn. (2d) 62, 221 P. (2d) 542. Considering the evidence in this light, we find that respondent, in its catalogs and technical literature, made representations that it manufactured a completely engineered underground prefabricated steam distribution system, and that its process of manufacture assured high thermal efficiency, long life, and economical installation. The system was represented

as being made of the most serviceable materials, under ideal conditions and closest inspection by skilled workmen. It was described as consisting of insulated pipes inside a strong conduit, which is presealed against all damage from water or deteriorating agents, and which will keep the pipe and its insulation in perfect condition to produce the highest efficiency possible with a minimum of heat loss. Installation instructions were furnished with the pipe.

For a clearer understanding of appellant's position, we summarize portions of his complaint. The complaint alleged that the plans and specifications were prepared for plaintiff's predecessors by Lincoln Bouillon & Associates under an oral agreement with Bliss Moore, Jr., the general architect; that the specifications provided:

"CONDUIT shall be 'Ric-Wil Pre-Sealed Insulated Pipe Units', in 20'-0" lengths, assembled at the factory and delivered ready for installation. The conduit shall consist of a heavy gage corrugated galvanized iron conduit, coated outside with a thick layer of asphalt, and wrapped to a smooth finish with asbestos asphalt-saturated pipe line felt.

" . . .

"INSULATION in the conduit shall be Ric-Wil 'Dry-Pac' and shall entirely fill the voids betweens the pipes and the conduit; . . . "

that the Navarre Plumbing & Heating Co. entered into a written contract with plaintiff's predecessors to furnish all materials and to perform all work necessary to construct a heating plant.

It was also alleged that "Ric-Wil Pre-Sealed Insulated Pipe Units" were supplied, manufactured, and furnished by The Ric-Wil Company, and were purchased for plaintiff's predecessors, and their benefit, in reliance upon recommendations, correspondence, advertisements, representations, and warranties made by The Ric-Wil Company; that the presealed, insulated pipe units and material would serve the specific purpose for which they were intended, *of which intended purpose the manufacturer had actual information and knowledge*; that said representations and warranties were made by Ric-Wil to and for the benefit of the engineer,

the architect, the contractor, and plaintiff's predecessors; that the latter did not and could not know that the system would not serve its purpose, until the leaks occurred in 1949.

Paragraph XV of the complaint alleged:

"That the aforesaid damage to plaintiff was directly and proximately caused by the above-named defendants' breaches of duties, warranties and contract and/or failure to exercise reasonable care in the following particulars:

"    .   .   .

"(c) In that (1) The Ric-Wil Pre-Sealed Insulated Pipe Units, joints, insulation and material supplied, sold and furnished by The Ric-Wil Company were defective and/or were inherently unsuitable for their intended use, of which intended use The Ric-Wil Company had actual knowledge, in violation of the warranties and representations made by the defendant The Ric-Wil Company in respect to the quality and suitability for said intended use of said pipe units and material; and/or (2) in that said defendant made negligent misrepresentations as to the quality and suitability of said pipe units, joints, insulation and material in respect to the intended use and purpose of which said defendant wrongfully supplied, sold and furnished defective and erroneous installation instructions and details in respect to the construction and installation of said pipe units and material, and/or (4) failed to exercise due care in the preparation and furnishing of said erroneous instructions and details."

The above allegations were all denied by The Ric-Wil Company. The allegations indicate, however, that plaintiff was suing in tort for breach of duty and in contract for breach of warranty.

Appellant's case was argued on two theories: (a) breach of warranties, express and implied, and (b) negligence of the manufacturer in designing and manufacturing the underground heating system, and in supplying faulty instructions to the contractors, Navarre Plumbing & Heating Co. The two theories will be discussed separately to demonstrate why it is our view that the appellant is entitled to have his case decided by a jury on the merits, and why he should not be turned out of court as a matter of law on the theory that there was no privity of contract between appellant and the manufacturer.

The appellant's theory of breach of warranty will be discussed first. The concept of warranties as contractual in origin and nature is fairly recent, as demonstrated by Professor Williston, 1 Williston, Sales (Rev. ed. 1948), § 195, 501. As there shown, recovery for breach of warranty was allowed a hundred years prior to the development of the action of special *assumpsit,* which form of action was the forerunner of the modern law of contracts. The first reported case in which recovery for breach of an express warranty was allowed in *assumpsit,* a form of action appropriate in the case of breach of a simple contract, seems to be *Stuart v. Wilkins,* 1 Doug. 18, 99 Eng. Rep. 15 (1778). In the *Stuart* case, tried to a jury and presided over by Lord Mansfield, a verdict for the plaintiff was entered. A motion was made to set aside the verdict and to nonsuit the plaintiff. It was contended that an improper writ had been *sued out* by the plaintiff; in other words, that an improper common-law form of action was used. The question was argued before the King's Bench, and judgment was entered for the plaintiff. Two of the judges said in their opinions that they had heard, for about twenty years, of such a form of declaration in actions for breach of warranty. From then on, this mode of declaration in stating a cause of action became standard, and warranties began to be looked upon as contractual in nature.

In the eighteenth century, when *Stuart v. Wilkins, supra,* and the cases following it, were decided, goods and chattels were manufactured or made largely on a custom basis involving a personal, over-the-counter relationship between the customer, on the one hand, and the artisan, or mechanic, who made the goods or chattels, on the other. Mass production, large scale or national promotion and distribution were unknown. Actually, there was little need for a legal remedy for a consumer against a manufacturer in a distant city who had sold products to a distributor, who, in turn, had sold them to a jobber, who had sold to retailers, who had then sold to consumers. At that time, in practically all lawsuits in the fields of contracts and torts, the factor of personal relationship was quite apparent and loomed quite large in

the consciousness of the law courts. The idea of a lawsuit by a consumer against a manufacturer, where no orthodox, over-the-counter, personal relationship existed, was unusual and seemingly quite difficult for the courts to contemplate. There is some similarity, perhaps, between the philosophy or logic of the privity of contract doctrine and that inherent in the remnants of the concept of *caveat emptor,* the latter, certainly, inherited from a time when business morality was, perhaps, somewhat different from that prevailing today.

In the past several decades, courts have become aware of and have recognized significant changes which have occurred in the methods of conducting business. Exceptions to the privity rule have been sanctioned. The first such exception developed where public policy considerations were the strongest; namely, in the case of the manufacture and distribution of *food for human consumption.* Our court pioneered in this development in the case of *Mazzetti v. Armour & Co.,* 75 Wash. 622, 135 Pac. 633 (1913), and the rule of the *Mazetti* case has been the law of this jurisdiction ever since. *Geisness v. Scow Bay Packing Co.,* 16 Wn. (2d) 1, 132 P. (2d) 740; *Baum v. Murray,* 23 Wn. (2d) 890, 162 P. (2d) 801. The same result has been reached in many other jurisdictions; see *Decker & Sons v. Capps,* 139 Tex. 609, 164 S. W. (2d) 828, 142 A. L. R. 1479. The exception to the privity of contract doctrine has been extended in our state to so-called inherently dangerous instrumentalities; *Baxter v. Ford Motor Co.,* 168 Wash. 456, 12 P. (2d) 409, 15 P. (2d) 1118, 88 A. L. R. 521; *Bock v. Truck & Tractor, Inc.,* 18 Wn. (2d) 458, 139 P. (2d) 706.

In a very recent case, *McAfee v. Cargill, Inc.,* 121 F. Supp. 5 (S. D. Calif., 1954), the principle of the *Mazetti* case has been extended to a case involving dog food. While the decision speaks in terms of the extension of an exception, nevertheless, the rule of privity of contract—at least in the field of food, whether for human or animal consumption—seems to have been so emasculated that little is left except vestigial remains. Since the *McAfee* case was concerned with an injury to a chattel (a prize dog), it is interesting

to speculate where the line between the rule of privity and the "exceptions" to it is to be drawn. Would the distinction be made on the basis of whether the chattel is a living animal or an inanimate object? The case simply illustrates the trend farther away from the rule of privity in warranty cases. With this in mind, and with some emphasis upon the well-known principle that the courts do not favor a multiplicity of lawsuits, it appears that a realistic, judicial analysis and reappraisal of the privity rule would be quite appropriate. However that may be, such a reappraisal is unnecessary for the disposition of the appeal in the case at bar.

The contract between the appellant and Navarre Plumbing & Heating Co. called for "Ric-Wil Pre-Sealed Insulated Pipe Units." The contract provided in minute detail for the type and size of pipes, type of insulation, etc. Navarre Plumbing & Heating Co. had no discretion at all in its choice of materials, and was entirely subject to supervision and control by the appellant in this respect. Under these circumstances, it would seem that Navarre Plumbing & Heating Co. was appellant's agent for the purchase of the insulated pipe from the respondent Ric-Wil.

The relation of principal and agent is consensual; it may be either express or implied; and, if the necessary elements are present, the relation exists whether the parties understood the exact nature of the relation or not. *Robbins v. Wilson Creek State Bank*, 5 Wn. (2d) 584, 105 P. (2d) 1107; Restatement, Agency, 7, § 1(1).

An agent is distinguished from an independent contractor who contracts to perform a job, but is not subject to control as to the means employed: Restatement, Agency, 11, § 2(3). In *Patent Scaffolding Co. v. Roosevelt Apartments*, 171 Wash. 507, 510, 18 P. (2d) 857, this court said:

"So far as this case is concerned, it may be said that if, by the terms of the contract, the *Roosevelt Apartments retained the right to control the method or manner in which the work was to be done, then the relation of principal and agent existed*. But, if the construction company represented the will of the owner only as to the result of the work, and

not as to the means by which it was to be accomplished, then the relation between the parties would be that of independent contractor." (Italics ours.)

In the *Patent Scaffolding* case, *supra,* the problem was whether the owner was liable to subcontractors upon default of the main contractor. The court held that, since the owner reserved the right to control the manner in which the contract was to be performed, the relation of principal and agent existed. See *Turnbull v. Shelton,* ante p. 70, 286 P. (2d) 676; Restatement, Agency, 47, § 14.

█ The concept of agency is flexible. The relation may be established for a limited purpose, or it may be broad. As said in *Kunz v. Lowden,* 124 F. (2d) 911, 913 (10th Cir. 1942):

" 'Agency' is a comprehensive term. It embraces an almost limitless number of relations between two or more persons or entities. It has been defined as 'a relation between two or more persons, by which one party, usually called the agent or attorney, is authorized to do certain acts for, or in relation to the rights or property of, the other, who is denominated the principal, constituent, or employer. Prof. Joel Parker, M.S. Lect. 1851.' 2 Bouv. Law Dict., Rawle's 3d Rev. p. 2687. The relationship may be expressly created, arise by inference from the relation of the parties without proof of any express agreement, or it may be created by law. Whether one is the agent of another for a specific purpose depends upon whether he has power to act with reference to the subject matter."

See, also, *Huckabee v. Pullman Co.,* 8 F. (2d) 43 (S.D. Georgia 1925), where the court held that a ticket agent employed or hired by a railroad, who sold tickets for the *defendant,* remitted the receipts to it, and followed its directions when so engaged, was an agent of the defendant. See, also, *Kurtz v. Farrington,* 104 Conn. 257, 132 Atl. 540, 48 A. L. R. 259.

█ Since Navarre Plumbing & Heating Co. was entirely subject to the appellant's control in its choice of insulated pipe (namely, Ric-Wil products), and did not exercise any independent judgment, it acted in the capacity of an agent, and the contract was between the appellant and the re-

spondent. Thus, all of the warranties, if they were in fact given and relied upon, were given to the appellant.

The appellant's second theory sounds in tort, in negligence. This, also, poses the question of privity, in effect: whether a manufacturer who advertises his merchandise nationwide, and sells to remote consumers in the regular channels of trade, owes a duty to use reasonable care to anybody but his immediate vendee, where the injury complained of is to property. It has been indicated above that, in the case at bar, the contract was made with the appellant as principal; but, assuming, for the moment, that no contractual relation existed between the parties, the question of privity respecting an action in tort is subject to critical analysis.

The leading case which denied recovery in a negligence action because the parties were not in privity of contract is *Winterbottom v. Wright*, 10 M & W 109, 152 Eng. Rep. 402 (1842). This case involved the driver of a mail-coach who was injured when the coach which he was driving broke down. The defendant was under a contractual duty to the postmaster general to keep the coach in question repaired, and the declaration alleged that he negligently failed to repair the coach, which omission and breach of duty caused the break down. The plaintiff, Winterbottom, who was employed by a partnership which contracted with the postmaster general to provide drivers and convey the mails, was denied recovery as a matter of law, as there was no privity of contract between him and the defendant. This decision of the court of Exchequer Chamber left the plaintiff remediless, since he could not sue the postmaster general because of the doctrine of sovereign immunity. The court expressed its regret, saying (by Baron Rolfe) at p. 405:

"This is one of those unfortunate cases in which there certainly has been damnum, but it is damnum absque injuria; it is, no doubt, a hardship upon the plaintiff to be without a remedy, but by that consideration we ought not to be influenced."

To reach the above-described result, the court in the *Winterbottom* case distinguished its previous decision in

*Levy v. Langridge,* 4 M & W 337, 150 Eng. Rep. 1458 (1838), where a minor, injured by a defective gun purchased for him by his father, was allowed to recover from the seller. The *Levy* case, in effect, used the theory of a third-party beneficiary contract, without calling it by that name, since the seller knew for whom the gun was being purchased. Compare our recent case of *Jeffery v. Hanson,* 39 Wn. (2d) 855, 239 P. (2d) 346.

In any event, the harshness and inflexibility of the rule of *Winterbottom v. Wright, supra,* prompted the courts to devise exceptions. In *Thomas v. Winchester,* 6 N. Y. 397, 409 (1852), the court allowed recovery in the instance of poison negligently labeled by the manufacturer as a harmless preparation, which injured a sub-vendee. Therein, the court said:

"The defendant's negligence put human life in imminent danger. Can it be said that there was no duty on the part of the defendant, to avoid the creation of that danger by the exercise of greater caution? or that the exercise of that caution was a duty only to his immediate vendee, whose life was not endangered? *The defendant's duty arose out of the nature of his business and the danger to others incident to its mismanagement. Nothing but mischief like that which actually happened could have been expected from sending the poison falsely labeled into the market; and the defendant is justly responsible for the probable consequences of the act. The duty of exercising caution in this respect did not arise out of the defendant's contract of sale to Aspinwall. The wrong done by the defendant was in putting the poison, mislabeled, into the hands of Aspinwall as an article of merchandise to be sold and afterwards used as the extract of dandelion, by some person then unknown.*" (Italics ours.)

Generally speaking, a radical departure from the rule denying recovery in negligence cases, where the parties were not in privity of contract, occurred in *MacPherson v. Buick Motor Co.,* 217 N. Y. 382, 111 N. E. 1050, because the instrumentality there involved (a defective automobile wheel) was not "inherently dangerous" in the way in which the poison, in *Thomas v. Winchester, supra,* had been. The *MacPherson* case is now universally followed. The last

jurisdiction to abandon the privity rule in tort cases involving injury to the person was Massachusetts, in *Carter v. Yardley & Co.*, 319 Mass. 92, 64 N. E. (2d) 693, 164 A. L. R. 559. See discussion of the problems involved in *Baxter v. Ford Motor Co.*, *supra*; *Bock v. Truck & Tractor, Inc.*, *supra*.

The exception recognized in *MacPherson v. Buick Motor Co.*, *supra*, has not been confined to injuries to the person. Thus, in *Swenson v. Nairn*, 21 N. J. Misc. 70, 30 A. (2d) 897, the fact pattern of which is almost identical with the facts of the case at bar, the plaintiff owner of a dock contracted with the named defendant for the remodeling and modernization of his facilities, which included the replacement of his steam power plant with electric motors. The contract provided that the motors should be Westinghouse Electric, of a given capacity and type. Westinghouse, the other defendant, knew of the project and supplied the plans and specifications. Allegedly, the motors were negligently made and installed, and caused damage to the plaintiff's property. Westinghouse, the manufacturer and one of the defendants, moved to strike the plaintiff's amended complaint as to Westinghouse on the ground that there was no relation between the parties which would impose upon Westinghouse a duty of due care. The motion was denied. In *Swenson v. Nairn*, *supra*, at p. 74, the court said:

"It is true as a general rule, where the duty violated by the defendant was created solely by contract, that a cause of action arising out of such a violation is limited strictly to the parties in the contract and those in privity with them. *No privity of contract is necessary, however, to sustain an action in tort by an individual specially injured by an act or omission constituting a breach of contract where it also constituted an invasion of the legal right of, or the violation of a legal duty owed to, the plaintiff, independently of or concurrently with the contract.*" (Italics ours.)

Similarly, in *Todd Shipyards Corp. v. United States*, 69 F. Supp. 609 (D. Me., 1947), the libelant dock company brought a libel in admiralty against the United States and the Steel Products Company. The libelant was repairing a ship for the navy department, which supplied it with a block

manufactured for the navy department by the claimant Steel Products Company. The block was to be used by the libelant in lifting or hoisting items in making the repairs. The block was, allegedly, negligently manufactured, and its mechanical failure caused damage to the libelant's property. The manufacturer moved that the libel, as against it, be dismissed, as there was no privity of contract between it and the libelant. The motion was denied, the court saying, at p. 610:

"I think the answer to that argument is that if we consider the rule as in force, and that this is a matter of enlarging the exceptions, there is no reasonable ground for making a distinction between injury to property and injury to the person. How can a general principle authorizing recovery of damages for the negligent act of another permit a man to recover for a sprained ankle and not for the destruction of his house? *The real answer to the argument, however, is that the asserted rule relied on, though formerly widely followed, has shrivelled up and died in the light of modern reason and authority.*" (Italics ours.)

See, also, *E. I. DuPont de Nemours & Co. v. Baridon,* 73 F. (2d) 26 (8th Cir., 1934).

The reasoning of the above cases is based upon fundamental concepts of the law of negligence. The wrong consists in an act creating an unreasonable risk of harm to the person or property of another, where it is foreseeable that the failure to use reasonable care will create such risk. *Palsgraf v. Long Island R. Co.,* 248 N. Y. 339, 162 N. E. 99, 59 A. L. R. 1253. In the case of a manufacturer who, through national advertising media such as magazines, newspapers, radio, and television, creates a demand for his product and does the affirmative act of putting such product in the channels of trade, it is foreseeable that, if reasonable care is not used in manufacturing, a risk of injury to the person or property *of the ultimate consumer* is apt or likely to result. Actually, in the final analysis, no other person in the distributive chain needs protection. The whole discussion of contract law in this tort area is misleading, since the duty of care on the part of the manufacturer does not arise out of contract, but *out of the fact of offering goods on the market*

*to remote users, as to whom there is a foreseeable risk of
harm, if due care is not used.*

Of course, for the risk to be foreseeable, the use to which
the goods are put must be the intended one. However, in the
case at bar, all of the elements of a tort are present, and,
if appellant can prove a failure to use reasonable care on
the part of the respondent manufacturer, he should be
entitled to recover.

Be that as it may, in the case at bar, there is an even
more compelling reason why the judgment of the trial court
should be reversed on the negligence theory. The respon-
dent manufacturer not only owed a duty to the appellant
as the ultimate consumer, as to whom the possibility of
injury was foreseeable, but, more particularly, because re-
spondent was aware of the appellant's existence, of the
project undertaken, and of the purpose for which Navarre
Plumbing & Heating Co. was buying the insulated pipe units.
As the evidence indicates, the respondent actually partici-
pated in the preparation of plans and specifications for the
underground heating system. In *Glanzer v. Shepard,* 233
N. Y. 236, 135 N. E. 275, 23 A. L. R. 1425 (a case involving
similar problems), beans in bags were sold by A to B at an
agreed price per pound. The beans were weighed by C, a
public weigher employed by A. The weighing was done
negligently. B overpaid A. B sued C. The New York court
of appeals, through Cardozo, J., allowed recovery, based on
the fact that C knew of the sale, the identity of the vendee,
and that the vendee, B, relied upon C in determining the
weight and price to be paid for the beans. In the *Glanzer*
case, *supra,* the court said at p. 238:

"We think the law imposes a duty toward buyer as well
as seller in the situation here disclosed. The plaintiffs' use of
the certificates was not an indirect or collateral consequence
of the action of the weighers. It was a consequence which,
to the weighers' knowledge, was the end and aim of the
transaction. Bech, Van Siclen & Co. ordered, but Glanzer
Brothers were to use. The defendants held themselves out
to the public as skilled and careful in their calling. They
knew that the beans had been sold, and that on the faith of
their certificate payment would be made. They sent a copy

to the plaintiffs for the very purpose of inducing action. All this they admit. In such circumstances, assumption of the task of weighing was the assumption of a duty to weigh carefully for the benefit of all whose conduct was to be governed. *We do not need to state the duty in terms of contract or of privity. Growing out of a contract, it has none the less an origin not exclusively contractual. Given the contract and the relation, the duty is imposed by law."* (Italics ours.)

See, also, *Ultramares Corp. v. Touche,* 255 N. Y. 170, 174 N. E. 441, 74 A. L. R. 1139; *Mulroy v. Wright,* 185 Minn. 84, 240 N. W. 116.

■ In the case at bar, the respondent manufacturer was fully aware that the proper heating of the Bellevue Shopping Square (with a minimum loss of heat and with a long life for the insulated pipes, free from destruction by rust and corrosion) was not "indirect or collateral," but, on the contrary, was "the end and aim of the transaction." Under such circumstances, there was a duty on the respondent manufacturer to use reasonable care not to cause an injury to the appellant or his property.

On a motion for a nonsuit, the cause of action against the Ric-Wil Company, the manufacturer, was withdrawn from the jury as a matter of law. We express no views as to the ultimate merits or outcome of this case; however, we are convinced, for the reasons stated hereinbefore, that, under the facts alleged in the complaint, appellant should have the right to a trial on the merits. The judgment dismissing the Ric-Wil Company should be reversed and the cause should be remanded for further proceedings. It is so ordered.

HAMLEY, C. J., HILL, WEAVER, and ROSELLINI, JJ., concur.

MALLERY, J. (concurring specially)—The plaintiff and his predecessors in interest owned certain real property in the unincorporated town of Bellevue, Washington, upon which they erected several buildings. They let a contract on bids to Navarre Plumbing & Heating Co. for the installation of a central steam-heating system, the plans and specifications for which were prepared by Lincoln Bouillon & Associates.

The Ric-Wil Company manufactured and supplied the material, consisting chiefly of underground pipes, in accordance with a blue print it prepared for the job.

This is an action against (1) the Navarre Plumbing & Heating Co., who, as independent contractors, installed the heating system; (2) the Lincoln Bouillon & Associates, who, as engineers, prepared the plans and specifications; and (3) The Ric-Wil Company, who manufactured and supplied the material for the job. Damages are claimed on a breach of warranty for alleged defects which developed in the steam-heating plant within two years after its installation.

At the end of plaintiff's case, the trial court dismissed the action as to The Ric-Wil Company, upon the ground that there was no privity between them. The jury returned verdicts for the other defendants, and judgment was entered accordingly.

Plaintiff's appeal is from the judgment of dismissal of The Ric-Wil Company only, and presents but one question: Is there privity between the parties upon which appellant can maintain this action against respondent, The Ric-Wil Company?

In this case, involving specially prepared building material for a particular building, the question of privity is determined by statute. Rem. Rev. Stat., § 1129 [*cf.* RCW 60.04.010], provides, *inter alia*:

"Every person . . . furnishing material to be used in the construction . . . of any . . . building . . . has a lien upon the same for the . . . material furnished by each, respectively, whether . . . furnished at the instance of the owner of the property subject to the lien or his agent; and every contractor, subcontractor, architect, builder or person having charge of the construction . . . *shall be held to be the agent of the owner* for the purposes of the establishment of the lien created by this chapter: . . ." (Italics mine.)

There are no equities in the case that create an exception or weaken the logic of the statute, because respondent knew who the user and ultimate buyer was, and furnished the material for this job according to particular specifica-

tions. It was immaterial to it whether the Navarre Plumbing & Heating Co. was an ordinary agent or a statutory agent.

If respondent had not been paid, it would have invoked the statute and the privity incident to foreclosure proceedings. This would have been just and equitable, because appellant became the immediate vendee under the statutory agency of the independent contractor.

The principle of *respondeat superior* is always limited by the course and scope of the agency, and, in the instant case, is confined to the agent's purchase of the building materials for its principal.

A statutory materialman's lien foreclosure is an action *in rem*. This, however, is immaterial, since even an action *in rem* is subject to defenses. The most common kind of a defense to such an action is that of breach of warranty for defective material. Hence, had it been necessary for respondent to foreclose its materialman's lien, appellant could have defended upon the ground that the materials were defective, provided, of course, he knew about it in time. Indeed, it is not unlikely that, had appellant known immediately of the claimed defects, the material would not have been paid for, and the breach of warranty would have been interposed as a defense to lien foreclosure thereby made necessary.

Privity is predicated upon the relationship of the parties, not upon the pendency of an action. A breach of warranty action, where an unwitting payment for building material was made before defects therein were discovered, should not be defeated simply because no foreclosure was commenced. Privity is never a one-way street. The relationship of privity runs both ways; either party can always predicate an action upon it according to the merits.

The judgment should be reversed.

SCHWELLENBACH, J. (dissenting)—The majority opinion indicates that Navarre was appellant's agent for the purchase of the insulated pipe from Ric-Wil. Freeman awarded the *contract* to Navarre to furnish materials and install the heating system. In fact, in this action, he sued Navarre *for*

*breach of contract.* I fail to find anything in the record which would make Navarre, Freeman's agent.

The only question presented in this appeal is whether appellant, the ultimate user, can recover from respondent, the manufacturer, in the absence of a specific contract between the two.

This state has kept in step with those jurisdictions recognizing exceptions to the privity of contract rule. In the case of *Mazetti v. Armour & Co.,* 75 Wash. 622, 135 Pac. 633, the plaintiff operated a restaurant. He purchased from the Seattle Grocery Company a carton of cooked tongue which was prepared and ready to be used for food without further cooking. The package had been manufactured and prepared by Armour & Co. In making the purchase, he relied upon the manufacturer's representations that the food was pure and wholesome. He served to one of his patrons a portion of the tongue. The patron became sick and nauseated and publicly exposed the service to him of the poisonous food. The restaurant owner sued Armour & Co. for damages, which ensued as a result of the above. In holding the manufacturer liable, we said:

"It has been accepted as a general rule that a manufacturer is not liable to any person other than his immediate vendee; that the action is necessarily one upon an implied or express warranty, and that without privity of contract no suit can be maintained; that each purchaser must resort to his immediate vendor. To this rule, certain exceptions have been recognized: (1) Where the thing causing the injury is of a noxious or dangerous kind; (2) where the defendant has been guilty of fraud or deceit in passing off the article; (3) where the defendant has been negligent in some respect with reference to the sale or construction of a thing not imminently dangerous. . . .

"To the old rule that a manufacturer is not liable to third persons who have no contractual relations with him, for negligence in the manufacture of an article, should be added another exception—not one arbitrarily worked by the courts—but arising, as did the three to which we have heretofore alluded, from the changing conditions of society. An exception to a rule will be declared by courts when the case is not an isolated instance, but general in its character and the existing rule does not square with justice. Under such

circumstances, a court will, if free from the restraint of some statute, declare a rule that will meet the full intendment of the law. No case has been cited that is squarely in point with the instant case, but there is enough in the adjudged cases to warrant us in our conclusion. . . .

"Our holding is that, in the absence of an express warranty of quality, a manufacturer of food products under modern conditions impliedly warrants his goods when dispensed in original packages, and that such warranty is available to all who may be damaged by reason of their use in the legitimate channels of trade."

In *Baxter v. Ford Motor Co.,* 168 Wash. 456, 12 P. (2d) 409, 15 P. (2d) 1118, 88 A. L. R. 521, Sam Baxter purchased a Model A Ford automobile from St. John Motors, a Ford dealer, which had acquired the automobile from the Ford Motor Company. He claimed that representations were made to him by both the dealer and the manufacturer that the windshield was of nonshatterable glass which would not break, fly or shatter. He was injured, losing an eye, when a pebble struck the windshield, causing glass to fly into his eye. The catalogs furnished by the manufacturer to the dealer for sales assistance, and relied upon by the purchaser, stated:

"All of the new Ford cars have a Triplex shatter-proof glass windshield—so made that it will not fly or shatter under the hardest impact. This is an important safety factor because it eliminates the dangers of flying glass—the cause of most of the injuries in automobile accidents. In these days of crowded, heavy traffic, the use of this Triplex glass is an absolute necessity."

We held the manufacturer liable to the ultimate purchaser and, referring to the food and drug cases, said:

"The rule in such cases does not rest upon contractual obligations, but rather on the principle that the original act of delivering an article is wrong, when, because of the lack of those qualities which the manufacturer represented it as having, the absence of which could not be readily detected by the consumer, the article is not safe for the purposes for which the consumer would ordinarily use it."

We then said:

"Since the rule of *caveat emptor* was first formulated,

vast changes have taken place in the economic structures of the English speaking peoples. Methods of doing business have undergone a great transition. Radio, bill boards and the products of the printing press have become the means of creating a large part of the demand that causes goods to depart from factories to the ultimate consumer. It would be unjust to recognize a rule that would permit manufacturers of goods to create a demand for their products by representing that they possess qualities which they, in fact, do not possess; and then, because there is no privity of contract existing between the consumer and the manufacturer, deny the consumer the right to recover if damages result from the absence of those qualities, when such absence is not readily noticeable."

*Bock v. Truck & Tractor, Inc.,* 18 Wn. (2d) 458, 139 P. (2d) 706, was a case in which a dealer sold a secondhand truck, which had been overhauled by him, to one La Vergne. The dealer represented that the truck had been completely overhauled and reconditioned. While La Vergne was operating the truck, owing to its faulty condition, the left front spring broke completely through, and the plaintiff, who was riding in the truck, was injured. In holding that the injured party could recover against the dealer, we said:

"In our opinion, it is but a logical extension of the rule announced in the case of *Baxter v. Ford Motor Co., supra,* to hold that a dealer in secondhand motor vehicles who undertakes to overhaul and recondition such vehicles for subsequent sale to the general public has the same duty as has the manufacturer to exercise reasonable care with reference to the equipment of the vehicle and with respect to the ascertainment of its condition, so that it may be kept under control and not become a menace to life and limb; and, further, that such duty rests not upon a contractual obligation, but rather on the principle that the delivery of a motor vehicle lacking in those qualities which the dealer represents it to have, or impregnated with defects which render the vehicle unsafe for its intended use and which defects the dealer could have ascertained by the exercise of reasonable care, constitutes an actionable wrong as to all those who suffer injury therefrom. This would include not only the immediate purchaser of the motor vehicle, but also those who the dealer should expect would use it or would be in the vicinity of its probable use, provided such injured person has not been contributorily negligent. It goes with-

out saying, of course, that the wrong is the more pronounced and reprehensible where the sale of the motor vehicle is accompanied by positive representations by the dealer that the vehicle has been completely overhauled and reconditioned, is fit for safe and proper operation upon the highways, and carries a guaranty of safety and fitness."

It will be seen that the exceptions to the privity of contract rule have arisen in tort actions where there has been a violation of a *duty* owed by the manufacturer to third persons; a duty which does not rest upon a contractual obligation, but rather a duty to members of the general public to prevent them from suffering injury as a result of the wrongful manufacture or distribution of any particular article or articles. That is not the situation here. True, appellant has been damaged, but he has not been wronged. There has been no violation of a duty to him which would give rise to a tort action. See *Cochran v. McDonald*, 23 Wn. (2d) 348, 161 P. (2d) 305. The warranty which the Ric-Wil Company gave was simply part and parcel of a contractual obligation, and appellant cannot recover unless he was in privity with that obligation.

The term "privity", used with respect to contract, implies a connection, mutuality of will, and interaction of parties. It is the relation that exists between two or more contracting parties, and its existence is essential to the maintenance of an action. *Wrenshall State Bank v. Shutt*, 202 Wis. 281. 232 N. W. 530.

Was there privity of contract between Ric-Wil and appellant's predecessors? The latter employed Bliss Moore, Jr., as general architect. He, not understanding heating and ventilating problems, employed Bouillon & Associates as consulting engineers for that purpose. They specified the use of Ric-Wil units. Navarre was awarded the contract to furnish materials and install the heating system. The contract of sale was between Ric-Wil and Navarre.

Mr. Bouillon testified that he wrote up the specifications from technical literature supplied by respondent's agent; that it was a new product, and that he had had no previous experience with it and that he got his information concern-

ing the qualities of insulation from the literature. He denied, however, that he relied upon such literature in specifying the use of Ric-Wil units.

The manufacturer knew that the system was sold to Navarre for use on appellant's project. The order and material list was marked for "Bellevue Central Heating Plant." Respondent prepared a shop drawing from the specifications and plans and marked it, "Ric-Wil Insulating Pipe Units for Underground Steam Distributing System, Bellevue Center, Bellevue, Washington." This was apparently done, however, after the contract of sale had been made with Navarre.

In *Cochran v. McDonald, supra,* Winterine Manufacturing Company manufactured an antifreeze product to be used in motor vehicles for the purpose of preventing freezing in cold weather. The antifreeze was put up in sealed gallon jugs, and to each jug the manufacturer affixed a label which contained a guaranty. McDonald purchased a large quantity from the manufacturer, sold part to Huletz Auto Electric Co., and it resold to a Texaco service station. Cochran, an ultimate purchaser, relying upon the printed representations, bought a gallon jug of the antifreeze from the service station. He put the antifreeze in the radiator of his automobile, resulting in damage to the radiator and motor. In denying recovery for breach of warranty, after discussing the cases to which I have referred, we said:

"We feel that, as no question of public policy is involved, and the reasons for the exception to the general rule of implied warranty in the law of sales applied in the food cases are absent, we would not be warranted in extending the rule of the cases cited to this case and in holding that a wholesaler is liable to a purchaser of the goods from a retailer upon either the theory of an implied warranty of quality or fitness for the purpose intended, or upon the theory that the wholesaler had sold an article that ultimately proved dangerous to property when used for the purpose for which it was manufactured."

In the instant case, in ruling on the motion to dismiss, the trial court said: "I feel clear that unless the law is changed by the Supreme Court, that the defendant Ric-Wil is not liable under the evidence." I agree with the trial court.

This case does not come within the purview of exceptions to the privity of contract rule enunciated in the *Mazetti, Baxter,* and *Bock* cases. However, I am very fearful that the decision herein will result in the privity of contract rule being thrown out of the window.

I have no quarrel with the holdings in the above mentioned cases. They all involved tort actions where there had been a violation of duty owed by a manufacturer to third persons. A tort is a private or civil wrong or injury—a wrong independent of contract. No tort was committed here. There was a breach of a common, everyday, run-of-the-mill contractual obligation. Freeman should not recover from Ric-Wil because there was no privity of contract between them.

The judgment should be affirmed.

DONWORTH and OTT, JJ., concur with SCHWELLENBACH, J.