John VEEDER, Plaintiff,

v.

NC MACHINERY COMPANY, a
Washington corporation,
Defendant.

No. C88 536M.

United States District Court,
W.D. Washington,
at Seattle.

May 4, 1989.

Matthew Phillip Veeder, Anthony Martin Urie, Seattle, Wash., for plaintiff.

David J. Farrell, Jr.; Maritime Law Offices of Squires & Farrell, Seattle, Wash., for defendant.

## ORDER GRANTING NC MACHINERY'S MOTION FOR SUMMARY JUDGMENT

McGOVERN, District Judge.

Plaintiff's port engine failed in Bristol Bay, Alaska during June 1987 and was replaced that August by defendant NC Machinery Company (NC). Plaintiff alleges that the engine was damaged before he received it, but does not assert breach of contract or warranty claims. Plaintiff does assert claims for negligence, strict liability, misrepresentation and punitive damages, and Consumer Protection Act violations.

### I. *Limitation of Remedy*

NC contends that Veeder is bound by the limitation of liability provision in the

Purchaser's Order because Modutech was acting as Veeder's agent for that purchase.

Concerning the creation of an agency relationship:

> The only element required for authority to do acts or conduct transactions not involving writings or seals is the communication by one person to another that the other is to act on his account and subject to his orders. Acceptance by the other is unnecessary; he has the power, although he does not become an agent until he accepts.

W. Seavy, *Law of Agency*, Ch. 2, § 18 (1964).

NC contends that Plaintiff empowered Modutech Marine, Inc. (Modutech) to act as his agent for the purchase of the marine engine that is the subject of this lawsuit. Plaintiff John P.V. Veeder and Modutech entered into a written agreement for the construction of a vessel. (Deposition of John P.V. Veeder at 23 and Exhibit 1 (vessel construction agreement.)) Veeder was actively involved in the project having built boats before and having technical knowledge to make certain decisions concerning the boat's components and engine power. (Veeder Dep. 4—5, 58, and 193—94.) Veeder explained in his deposition:

> Q. Well, now, getting onto a little different subject here, I would like to ask what sort of things occurred back at the time you were selecting components for this boat and making the deal with Modutech that you did.
>
> It sounds as though you did quite a bit of your own exploration into what were the best components in this boat, is that correct?
>
> A. Modutech did none of that for me. I knew what I wanted.
>
> What I wanted out of them was that hull, the cabin, the fly bridge, the deck, the building to build it in, and the assistance of their people there to help me along with the construction.
>
> I worked every day down there with those people.
>
> Q. Yeah.
>
> Did they provide you with information about the Caterpillar engine being preferable to the GMC, or did you sort of seek this information out yourself?
>
> A. No, I was on my own on all that.
>
> Q. And so then you, what, contacted Volvo and the different people—
>
> A. I had talked to different engine distributors, or their sales representatives— ... and with the information I had gathered, I made my own decisions as to what power was going to be put into that boat.

(Veeder Dep. at 193—94.)

Veeder determined what engines he wanted Modutech to purchase:

> I changed engines in this boat.... I was originally going to go with.... 300 horse GMCs.... Those are what I instructed them [Modutech] to order for me.... I changed my mind later and went with the Caterpillar engines.

(Veeder Dep. at 42, 1. 22 to 43, 1. 16.) Veeder wanted to purchase the engines through Modutech because "Carl gets a better discount." (Veeder Dep. 42, 1. 7, referring to Modutech's President.)

Modutech purchased the engines for $17,066 with its 25% builder's discount and sold them to Veeder for $18,000 each. (Dep. of Carl Swindahl, President of Modutech, 24—27.) Veeder wanted the engine warranties to be his own; he stated:

> What Carl has that I want is the hull, the house, the deck, the work space. I tell him what I want purchased, he purchases it. And, uh, you get his price and the product is mine and the warranties are mine. It doesn't go through to Modutech.

(Veeder Dep. 42, 11. 11—15.) Veeder said this included engines, too. (*Id.* 11. 19—20.) The contract provided on page 6 that Modutech would assign the warranties to Veeder. Veeder further explained as to the warranties under questioning from his attorney:

> Q. When you entered into your agreement, as you mentioned earlier, with Modutech in regard to this PACIFIC PRIDE LIMITED building, in respect to the warranties, how did you go about obtaining them?

A. Well, I had talked with Carl [Modutech's President], explaining to him that I wanted to buy components through his builder's discount; that I expected the warranties to be mine and mine only. And that's the way it had been and that was the understanding we had.

Q. So it's my understanding then that you requested the warranties?

A. Yes, I requested the warranties.

Q. Was Modutech acting as your agent in the purchase of the NC engines?

A. Yes.

(Veeder dep. at 216—17.)

Resisting this Motion for Summary Judgment, Plaintiff denies in every respect that any agency existed between he and Modutech. He submits additional affidavits that contradict his deposition testimony. For example, in his deposition at 46, he states that NC "sold the engine to me":

Q. How can that be?

A. It's the same way I bought all of the others.

Well, like I said, I, uh, buy through Carl, being that he gets a better discount. And that's the arrangement we've had for four years, that I don't want to deal with Carl when I have a problem. I want to have the power to go directly to the people that sold me the shaft, or the people that sold me the props, the motors. Anything I've purchased through him, I want to be able to go right—I don't want to deal with Modutech. He gets a better price than I do on a lot of things and I wanted to take advantage of that, and retain all the warranties and the rights to get warranty work or whatever I needed myself, without having to depend on them to try and work things out. Because that takes a lot of time, usually, and they don't want to mess with it. And I get better results doing it myself.

(Veeder dep. at 46—47.) In his Affidavit of February 2, 1989, Veeder explains that he "felt as though NC had sold the engine to me" (Veeder Affidavit at ¶ 2) because he had extensive discussions with NC over the course of several years and because he never dealt with Modutech concerning warranty problems. He also states that "technically, NC did sell the engine to Modutech," but all he did was to pay Modutech for building a vessel that included the engine in question. (*Id.*)

While in his deposition Veeder stated as quoted above that whatever he wanted purchased, Modutech would purchase, in his affidavit he states that he never asked Modutech to act in his behalf for the purchase of component parts:

I can now clearly state that Modutech was never an agent of mine in the purchase of the NC engines. To the best of my understanding, Carl sold me a vessel which included two engines just as it states in the contract that I entered into with Modutech, on page 11....

In actuality, I merely provided Modutech with money to build me a fishing vessel pursuant to our contract, and that is all.

(Veeder Aff. ¶¶ 3 & 7.)

While in his deposition Veeder stated that he changed his mind about the engines to be put in the vessel and instructed Modutech accordingly, in his affidavit, Veeder states:

Quite frankly, Carl Swindahl is a very good, yet shrewd businessman, Carl made sure that I was legally bound to him in every way. For instance, if I failed to comply with any term or condition in our contract, Carl Swindahl made sure that Modutech could keep all of the monies that I paid to them in addition to sueing [sic] me for breach of contract. This, I assure you, shows that in no way did I have control over Modutech regarding any aspect of any matter that I dealt with Modutech.

(Veeder Aff. ¶ 6.)

The supplemental affidavits submitted by Veeder do not create a question of fact that precludes summary judgment on the issue of agency. In view of the contract providing for the warranties to flow directly to Veeder with no obligation whatsoever upon Modutech, the conduct of Veeder in designating which engines to purchase, Veeder's statement that Modutech purchased what Veeder directed it to purchase in order that Veeder would get a better

discount, and there being no evidence to contradict that Modutech made the purchase, and that it purchased engines that Veeder wanted it to purchase, the conclusion is inescapable that Modutech was acting as Veeder's agent for the purchase of the engine in question. Veeder's affidavit contains bare conclusions that are not supported by these uncontroverted facts. Such contrary affidavits may be ignored. In *Foster v. Arcata Associates, Inc.*, 772 F.2d 1453 (9th Cir.1985), *cert. denied*, 475 U.S. 1048, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986), the Ninth Circuit considered "as credible only appellant's deposition testimony" when her subsequent declarations were "in direct contradiction." *Id.* at 1462. The Court cited its earlier decision in *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 544 (9th Cir.1975):

> [I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

On the issue of agency, the Washington Supreme Court held in *Turnbull v. Shelton*, 47 Wash.2d 70, 73, 286 P.2d 676, 678 (1955), that control over purchases evidences an agency relationship and is inconsistent with an independent contractor status. In that case an owner asked a second party (Sager) to purchase equipment, in part because that person could obtain a discount; Sager made the purchases in his own name. While the Court noted that Sager played a number of roles, including independent contractor and joint venturer, it held that Sager was at all times the agent of the owner. *Id.* at 71, 286 P.2d at 677.

In another Washington case, *Freeman v. Navarre*, 47 Wash.2d 760, 289 P.2d 1015 (1955), a shopping center developer contracted with a heating system installer to furnish materials and construct a heating plant with the type of insulated pipe materials being specified in the contract and the installer having no discretion in this respect. The Court noted:

> The relation of principal and agent is consensual; it may be either express or implied; and, if the necessary elements are present, the relation exists whether the parties understood the exact nature of the relation or not....
>
> Since [the installer] was entirely subject to the [developer's] control in its choice of insulated pipe ..., and did not exercise any independent judgment, it acted in the capacity of an agent, and the contract was between the [developer] and the [pipe supplier/manufacturer/furnisher]. Thus, all of the warranties, if they were in fact given and relied upon, were given to the [developer].

*Id.* at 767–79, 289 P.2d at 1019.

When material facts relative to the question of agency are undisputed and susceptible of only one interpretation, the question of agency is a question of law that may be decided by the Court on summary judgment. It is established that Modutech contracted to purchase equipment, including engines, according to Plaintiff's specifications, Modutech purchased those engines in accordance with Plaintiff's instructions, and Modutech made the purchases without exercising independent judgment. Accordingly, it is established that Modutech acted as Plaintiff's agent in the purchase of the engine that is the subject of this dispute.

■ The next question is the validity of the Limitation of Remedy contained in Paragraph 7 of the Purchaser's Order Modutech signed for the engine purchase from NC. If the Limitation of Remedy is valid, it will be enforceable against Veeder. An agent's knowledge is imputed to the principal. *Todd Shipyards Corp. v. Turbine Service, Inc.*, 467 F.Supp. 1257, 1297 (E.D.La.1978), *aff'd in pertinent part*, 674 F.2d 401 (5th Cir.1982); *Restatement (Second) of Agency* § 272 (1958).

The NC purchase order, dated November 5, 1986, signed by Carl Swindahl of Modutech, is one page with provisions on the front and reverse sides. On the front side, in a combination of boldface and capitalized letters are the following provisions:

2. **Additional Terms and Conditions. THIS ORDER IS SUBJECT TO THE**

TERMS AND CONDITIONS ON THE REVERSE SIDE, INCLUDING DISCLAIMERS OF WARRANTY AND LIMITATION OF REMEDIES AVAILABLE WHICH SELLER AND PURCHASER HAVE NEGOTIATED AND WHICH PURCHASER HAS READ AND UNDERSTANDS AND TO WHICH IT AGREES....

3. **Required Acceptance and Method of Modification.** ... SELLER'S ACCEPTANCE OF THIS CONTRACT IS EXPRESSLY CONDITIONED ON PURCHASER'S ASSENT TO ALL OF THE CONDITIONS OF SALE ON THE FRONT AND REVERSE SIDE OF THIS ORDER. ANY ADDITIONAL OR DIFFERENT TERMS OR CONDITIONS WHICH MAY APPEAR IN ANY COMMUNICATION FROM PURCHASER ARE HEREBY OBJECTED TO AND SHALL NOT BE EFFECTIVE OR BINDING UNLESS SPECIFICALLY RECOGNIZED AND ASSENTED TO IN WRITING BY SELLER'S AUTHORIZED REPRESENTATIVE....

The above terms are within three inches of the signature line for Modutech. One inch above the line in boldface type and capitals is: "**(Additional terms on Reverse Side— IMPORTANT TO READ).**" Less then half an inch beneath Carl Swindahl's signature is a paragraph stating:

Agent acknowledges he/she has read, understands and agrees to the terms and conditions of this order, including the DISCLAIMER OF WARRANTY AND LIMITATION OF REMEDIES, and is authorized to execute this order.

On the reverse side of the purchase order are fifteen numbered paragraphs entitled "TERMS AND CONDITIONS OF SALE." Paragraph 7 states:

7. **Limitation of Remedies.** THE SOLE AND EXCLUSIVE REMEDY OF PURCHASER FOR DEFECTIVE EQUIPMENT SHALL BE AS PROVIDED IN ANY WARRANTY OR WARRANTIES RELATING TO THE EQUIPMENT AS REFERRED TO IN PARAGRAPH 6. SELLER SHALL IN NO EVENT BE LIABLE TO PURCHASER OR THIRD PARTIES, WHETHER FOR BREACH OF WARRANTY, FOR NEGLIGENCE OR STRICT LIABILITY IN TORT OR FOR ANY INCIDENTAL, CONTINGENT, SPECIAL OR CONSEQUENTIAL DAMAGES ARISING FROM OR OUT OF THE EQUIPMENT, INCLUDING, BUT NOT LIMITED TO, NO LIABILITY FOR LOSS OF PROFITS OR REVENUE, LOSS OF USE OF GOODS OR OTHER ITEMS TO BE FURNISHED TO PURCHASER HEREUNDER, COST OF CAPITAL, COST OF SUBSTITUTE EQUIPMENT, ADDITIONAL COSTS INCURRED BY PURCHASER AT ITS PLANT OR IN THE FIELD (WHETHER BY WAY OF CORRECTION OR OTHERWISE), OR CLAIMS BY PURCHASER, PURCHASER'S CUSTOMERS OR OTHER THIRD PARTIES, FOR DAMAGES RESULTING FROM PERSONAL INJURY OR PROPERTY DAMAGE....

The sales provisions of the Uniform Commercial Code apply to "transactions in goods," RCW 62A.2–102, and Modutech's purchase of engines from NC is such a transaction. The UCC provides for limitation of remedy at RCW 62A.2–719:

(1)(b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy....

Limitation of other consequential damages is valid unless it is established that the limitation is unconscionable.

The remedy to which Veeder is limited is that provided in the Caterpillar Warranty (SELF5043), replacement of the engine. NC replaced the engine and provided him with his exclusive remedy. Veeder is not entitled to other damages such as the consequential damages of lost profits and is limited to the remedy of replacement, unless the contractual limitation of remedies is shown to be unconscionable.

The UCC provides that an agreement may provide for remedies in addition or in substitution for those provided in Article 2 of the Code and may limit or alter the measure of damages recoverable unless the limitation under the circumstances is prov-

en to be unconscionable. *See* RCW 62A.2–302 and 2–719. The Court must determine unconscionability as a matter of law. RCW 62A.2–302. Moreover, "exclusionary clauses in purely commercial transactions are prima facie conscionable ... ," and "the burden of establishing that a clause is unconscionable lies upon the party attacking it." *Schroeder v. Fageol Motors*, 86 Wash.2d 256, 262—63, 544 P.2d 20 (1975).

*Schroeder* and *Mieske v. Bartell Drug Co.*, 92 Wash.2d 40, 593 P.2d 1308 (1979) set forth factors entering into a determination of unconscionability. In *Mieske*, the Supreme Court stated:

> No one element is controlling. The court must examine all the circumstances surrounding the transaction, including conspicuousness of the clause, prior course of dealings between the parties, negotiations about the clause, the commercial setting and usage of the trade. Not each element will be applicable factually to every transaction.

92 Wash.2d at 50, 593 P.2d at 1313.

As described above, the clause was not hidden in fine print but was highlighted by headings in bold typeface, there were repeated notices that additional terms were set forth on the reverse side of the page, the notice that the limitation of remedies was set forth on the reverse was printed in capital letters within one half inch of the signature line, and the limitation paragraph itself was printed in capital letters set off by a heading in bold typeface, **"Limitation of Remedies."**

Modutech's President, Carl Swindahl, had opportunity to be familiar with the provisions of the document he was signing both by virtue of his prior dealings with NC as well as at the time he signed the document in November 1986. While Swindahl stated he had not read the November 1986 Purchase Order, he stated that he did sign the document and that it was for the purchase of engines for Veeder's boat. (Swindahl dep. at 19.) But then Swindahl said, "If I thought it was a contract I would find my glasses. I didn't think this was a contract, to be honest with you. I thought it was a purchase order." (Swin-

dahl dep. at 20—21.) He did not volunteer that he could not read without his glasses when he signed the November 1986 purchase order. (*Id.* at 22—24.) Swindahl said he was a vain person and would not wear glasses. (*Id.* at 42.) Swindahl had signed similar purchase orders in 1978 when he had poor eyesight but did not wear glasses. (*Id.* at 40—42.) Swindahl as a businessman must be at least disingenuous when he states that he didn't believe the purchase order was a contract. Neither he nor plaintiff alleges that fraud by NC prevented him from reading the contract. Failure to read contract terms when not brought about by fraud does not excuse the signing party from compliance with those terms. *H.D. Fowler Co. v. Warren*, 17 Wash.App. 178, 181, 562 P.2d 646 (1977) (defendant claimed ignorance of contract terms found on the reverse side of the form and referred to plainly slightly below and to the left of the signature line).

The Supreme Court has spoken on the issue of remedies limitations in commercial settings:

> Contract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements. The manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies. See UCC §§ 2–316, 2–719. In exchange, the purchaser pays less for the product. Since a commercial situation generally does not involve large disparities in bargaining power, we see no reason to intrude into the parties' allocation of the risk.

*East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 2303, 90 L.Ed.2d 865 (1986).

Under all the circumstances, the limitation of remedies in paragraph 7 of the purchase order is not unconscionable. Accordingly, all Plaintiff's causes of action in this case must be DISMISSED.

While in view of the conclusion explained above the Court need not address the other bases for dismissal cited by NC, they will be touched upon briefly.

Concerning the negligence and strict liability claims, the Supreme Court in *East River* stated:

> When a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong.

106 S.Ct. at 2302. *East River* is particularly apt as it concerned turbines purchased in a commercial setting, one of which did damage to itself through the malfunction of an integral part while the vessel was at sea. The Supreme Court concluded:

> Thus, whether stated in negligence or strict liability, no products-liability claim lies in admiralty when the only injury claimed is economic loss.

*Id.* 106 S.Ct. at 2305. Similarly, in this case, there is only a claim of economic loss. "Other property damage" cited by Plaintiff appears to be de minimus (oil spray on cleanable surfaces, oil spray on a rug, *e.g.*), however, as he never submitted a claim to his underwriters nor pointed it out to his underwriters' surveyor. (Veeder dep. 205—06; Padie dep. 5—7 and 30—32.)

There is not a factual basis for the misrepresentation claim. While Plaintiff alleges that NC did not tell him that the engine had been dropped, after the first sea trial of the vessel, NC mechanic Mike Paull "had mentioned, just as we were finishing up, that the engine had been dropped." (Veeder dep. at 14.) Thus, Veeder could not rely on a contrary representation from NC, if any. Even when another NC serviceman, Wayne Valenta, discussed removing the engine from the boat to inspect it further after it had locked up and stopped during a trial run, Veeder "said he was in a hurry to put the boat on a barge that Saturday to go up north." (Valenta dep. at 18.)

Neither is there a factual basis for the Consumer Protection Act claim. The elements of such a claim are set forth in *Hangman Ridge Training Stables, Inc. v. Safeco Title Insurance Co.*, 105 Wash.2d 778, 719 P.2d 531 (1986):

(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property, (5) causation.

*Id.* at 780, 719 P.2d at 533. Viewed as a "consumer transaction" (see 105 Wash.2d at 790, 719 P.2d 531), first, no deceptive act can be shown as discussed under the misrepresentation claim. Second, there is no showing whatsoever that the alleged misrepresentation was part of a pattern or general course of conduct, or that similar acts had occurred before the act complained of by plaintiff, or that there was substantial potential for repetition; moreover, the act complained of appears merely to be a single transaction with no other consumers affected by it. Even viewed as a "private dispute," there is no showing that NC solicited Plaintiff to purchase the engine, nor that NC occupied a far superior bargaining position to Modutech, an experienced commercial boat builder.

Based upon the foregoing analysis, Plaintiff Veeder's Cross-motion for Summary Judgment is DENIED, NC Machinery Company's Motion for Summary Judgment is GRANTED, and Plaintiff's cause of action is DISMISSED.