**DELMARVA POWER & LIGHT, a Delaware and Virginia Corporation, Plaintiff,**

v.

**METER–TREATER INC., a Florida Corporation, Defendant.**

**No. 98–590 GMS.**

United States District Court, D. Delaware.

July 31, 2002.

Somers S. Price, Jr., Gregory A. Inskip, David Moore, Timothy M. Holly, Potter, Anderson & Corroon, Wilmington, DE, for plaintiff.

R. Stokes Nolte, Nolte, Brodoway & Saltz, Wilmington, DE, of Counsel: Wayne E. Babler, Jr., Matthew J. Duchemin, Quarles & Brady, Milwaukee, WI, for defendant.

### MEMORANDUM AND ORDER

SLEET, District Judge.

The Plaintiff, Delmarva Power & Light ("Delmarva") is a consumer electricity provider serving customers in Delaware, Maryland, and Virginia.[1] The defendant, Meter–Treater, Inc ("Meter–Treater") is a manufacturer of electrical components for electric meters. Delmarva asserts that it purchased some of Meter–Treater's electrical surge protectors for its residential service meters in 1996. The plaintiff alleges that Meter–Treater's surge protectors were defective and forcefully expelled

---

1. Subsequent to the filing of this action, Delmarva merged with the Conectiv power company. Consequently, Delmarva is now known as Conectiv. However, for ease of discussion, the court will refer to the plaintiff as Delmarva in this writing.

themselves from Delmarva's meters when the electrical circuits overloaded. Delmarva therefore concluded that the surge protectors were a danger to its consumers and removed all of the Meter–Treater surge protectors from its meters. Delmarva claims that it incurred great cost in the replacement of meters.

On October 15, 1998, Delmarva commenced this action against the defendant. Delmarva asserts that Meter–Treater's alleged actions give rise to claims sounding in breach of contract, breach of express warranty, breach of the implied warranty of merchantability, breach of the implied warranty of fitness for a particular purpose, and negligence.

The court held a pre-trial conference in this case on May 14, 2002. A review of the proposed jury instructions and other pretrial materials revealed that Meter–Treater believes that the plaintiff's negligence claims are barred by the economic loss doctrine as adopted in Delaware and other jurisdictions. The parties and the court agreed that the economic loss issue was a legal question to be decided by the court, rather than the jury. Although the dispositive motion deadline had lapsed, the court directed the parties to brief the economic loss issue pursuant to an agreed-upon schedule.

Presently before the court is the defendant's Objection to the Jury Instructions in Tort on the Economic Loss Doctrine (D.I.141), which the court will treat as a Motion for Partial–Summary Judgment.[2] In the motion, Meter–Treater states that the economic loss doctrine only permits

recovery for purely financial losses where there has been some injury to persons or property other than the defective product. Meter–Treater asserts that since the meters were the only property that was damaged, Delmarva's recovery is barred. Meter–Treater further contends that even if other property was damaged, such damage was too *de minimis* to bring it within the scope of the economic loss doctrine. Delmarva responds that its meters are separate from the Meter–Treater surge protectors. Therefore, if its meters were damaged, there was damage to other property. Delmarva also argues that other property was damaged due to the "damage" incurred by its distribution system when Meter–Treater's hazardous and defective products were incorporated into it. Meter–Treater refutes these arguments by noting that the surge protectors and the meters were integrally connected and therefore part of the same property. Meter–Treater also states that Delmarva has provided no evidence of any tangible harm to its electrical distribution system. Finally, to the extent Delmarva argues that Meter–Treater's surge protectors made its system more dangerous, Meter–Treater responds that Delmarva's cases are inapposite and not controlling.

Upon review of the facts, the law, and the parties submissions, the court concludes that Delmarva's claims are barred by the economic loss doctrine. The court finds that although Delmarva's meters were damaged, the meters and the surge protectors were part of the same unit. Therefore, no separate property was dam-

---

2. Delmarva, the non-movant, first suggested that this motion be treated as a motion for summary judgment. The defendant-movant does not oppose this suggestion. Since the parties agree that conversion to summary judgment is appropriate and both parties have had ample opportunity to present any evidence (Delmarva attached 32 exhibits to its

answering brief, Meter–Treater attached 16) the court finds that neither party will be prejudiced by the conversion of this "motion" into a motion for summary judgment. The court will therefore apply the legal standards applicable to a summary judgment motion in this memorandum and order.

aged. Moreover, to the extent that other property was damaged, the court finds that the property damage was *de minimis*. Finally, the court finds that Delmarva's claim that its system was made more dangerous is not supported by the law or the record. The court will now explain the reasons for its ruling.

## I. FACTS

Delmarva is a regulated utility that provides electricity to residential and business consumers in the states of Delaware, Maryland, and Virginia. In 1995, Delmarva sought to introduce a new service called Surge Solution to its residential customers. Surge Solution was intended to protect the customer's electrical appliances in the event of an electric surge caused by a lightning strike, a downed electrical wire, or other such electrical overvoltage source.

In order to implement the Surge Solution program, Delmarva had to purchase surge protection devices, or SPDs. Between March 12, 1996 and November 26, 1996, Delmarva and Meter–Treater entered into a series of contracts for the purchase and sale of the SPDs. Eventually, Delmarva purchased 20,000 Model 240 SPDs from Meter–Treater. Delmarva then began installing the SPDs at the homes of its residential customers. As Delmarva states, "[T]he Model 240 Units were not stand-alone products. Rather, as admitted by Meter–Treater, the Unit, the meter, and the meter box became an 'integrated unit'" (D.I. 142 at 3.) Indeed, Delmarva states that the SPDs had to be "specially installed into the meter box and grounded, which required additional connection of the Units to the meter box." (*Id.*) Thus, special installation and equipment were necessary to "integrate" the SPD's into Delmarva's utility system. (*Id.* at 4.) Indeed, Delmarva states that Meter–Treater's instructions stated that if the SPDs were not properly installed, they could be "lethal" since electrical current might still flow though the unit.

Delmarva first experienced problems with Meter–Treater's product in October 1996. At that time, an electric meter at the home of one of Delmarva's customers was forcefully expelled from the SPD during an overvoltage incident. These expulsions persisted during the Fall of 1996 and continued into the Spring of 1997. Delmarva alleges that these expulsions caused damage to its meters. A representative description of the damages to various meters reads as follows: "BLEW OUT MTR [meter] FRNT [front] GLASS OF BOX"; "SURGE BLEW MTR OFF HSE [house]"; "POWER SURGE BLEW METER OUT & BURNT UP—REPLACED BOTH"; "POWER SURGE DESTROYED SURGE & BLEW METER OUT. DAMAGED—REPLACED BOTH"; "BLEW METER OFF WALL." (D.I.142, Ex. 20). Delmarva further alleges that these expulsions forcefully propelled the meter components into customer property. According to Delmarva, the meter expulsions caused one automobile to be dented and another to suffer a broken windshield. No repair estimate was submitted for the dented automobile. However, the cost to repair the broken windshield was estimated at $171.36. (D.I.141, Ex. 14.) The record contains absolutely no evidence of damage to any other property. Additionally, no people were ever harmed by the expelled meters.

After Delmarva discovered the problem with Meter–Treater's SPDs, it became very concerned about the safety of the devices. Therefore, Delmarva engaged in a very lengthy and expensive series of tests to determine the compatibility of its system with the Meter–Treater devices. At the completion of its testing, Delmarva concluded that the Meter–Treater products were not suitable for its purposes.

Delmarva then initiated a massive recall for the SPDs that were previously installed. Delmarva estimates that the testing and recall procedures cost the company $375,231.00. Delmarva seeks to recoup these losses in this lawsuit as well as $1.4 million for the diminution in value of the SPD units and $3.6 million in profits lost due to the resultant failure of the Surge Solution program. Delmarva's total requested recovery is therefore approximately $5.4 million.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P 56(c). A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmovant. *See In re Headquarters Dodge, Inc.*, 13 F.3d 674, 679 (3d Cir.1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). When deciding a motion for summary judgment, the court must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Pacitti v. Macy's*, 193 F.3d 766, 772 (3d Cir.1999). The nonmoving party, however, must demonstrate the existence of a material fact supplying sufficient evidence—not mere allegations—for a reasonable jury to find for the nonmovant. *See Olson v. General Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir.1996) (citation omitted). To raise a genuine issue of material fact, the nonmovant "need not match, item for item, each piece of evidence proffered by the movant but simply must exceed the 'mere scintilla' [of evidence] standard." *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir.1993) (citations omitted). The nonmovant's evidence, however, must be sufficient for a reasonable jury to find in favor of the party, given the applicable burden of proof. *See Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505.

## III. DISCUSSION

The court will first outline the economic loss doctrine as adopted in Delaware. The court will then address the whether there was any damage to "other property" under the economic loss doctrine, and whether such damage was *de minimis*. Finally, the court will discuss whether Delmarva can recover under the economic loss doctrine because its system was rendered unreasonably dangerous by Meter–Treater's product.

### A. The Economic Loss Doctrine in Delaware

■ One of the leading cases on the economic loss doctrine in Delaware is *Danforth v. Acorn Structures, Inc.*, 608 A.2d 1194 (Del.Super.Ct.1992). *See Marcucilli v. Boardwalk Builders, Inc.*, No. Civ.A. 99C–02–007, 1999 WL 1568612, at *4 (Del.Super.Ct.1999) (noting that *Danforth* is the leading case on this issue). In *Danforth*, the court stated, "The economic loss doctrine is a judicially created doctrine that prohibits recovery in tort where a product has damaged only itself (*i.e.*, has not caused personal injury or damage to *other* property) and the only losses suffered are economic in nature." *See Danforth*, 608 A.2d at 1195 (emphasis in original). The court further defined economic losses as those losses that are "damages for inadequate value, *costs of repair and replacement of the defective product*, or consequent loss of profits—without any claim of personal injury or damage to *other* property, as well as the diminution in value of the product because it is inferior in quality and does not work for the general purposes for which it is manufactured

and sold." *See id.* at 1195 n. 3 (emphasis in original) (citations and internal quotations omitted). The court stated that where solely economic losses were sought and no damage to persons or other property had occurred, the plaintiff is limited to remedies under the Uniform Commercial Code, and may not proceed in tort. *Id.* at 1195–97.

### B. Damage to "Other Property"

*Danforth* teaches that although some economic losses might be recoverable in tort, such purely economic recovery cannot occur in the absence of damage to "other property." The *Danforth* case, however, failed to define what "other property" might be. Specifically, it did not address the question presented by the present case, which is whether, when two separate parts are integrated into one functioning whole, damage to either integrated piece by the other component constitutes damage to "other property" for which tort recovery is allowed—or damage to the property itself, for which no tort recovery can be had. Less obliquely, the primary question is whether the damage to Delmarva's power meters, to which the SPDs were admittedly connected, is damage to other property. Delmarva argues that the SPDs caused damage to other property because they damaged the meters. Meter–Treater responds that the SPDs were incorporated into the meters, thereby making them part of the same property.

Although *Danforth* failed to define "other property," the *Danforth* court relied heavily on the United State Supreme Court's decision in *East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). In *East River,* the Supreme Court provided some guidance on what might be considered other property. The plaintiff in *East River* sought economic recovery for damage sustained by its steamship's faulty turbines. *Id.* at 859–60, 106 S.Ct. 2295. The turbines were connected to the steamship, and although the turbines malfunctioned, the steamship itself was unharmed. In rejecting the plaintiff's arguments for recovery, the Court stated:

> "In the traditional 'property damage' cases, the defective product damages other property. In this case, there was no damage to 'other' property. Rather, the first, second, and third counts allege that each supertanker's defectively designed turbine components damaged only the turbine itself. Since each turbine was supplied by Delaval as an integrated package, each is properly regarded as a single unit. Since all but the very simplest of machines have component parts, a contrary holding would require a finding of 'property damage' in virtually every case where a product damages itself. Such a holding would eliminate the distinction between warranty and strict products liability."

*Id.* at 867, 106 S.Ct. 2295 (citations omitted). Following *East River's* guidance, at least one other court has held that "damage to component parts cannot be sufficient property damage to bring the action into tort." *See Florida Power & Light Co. v. McGraw Edison Co.,* 696 F.Supp. 617, 619 (S.D.Fla.1988).

■ The evidence adduced thus far clearly demonstrates that the SPDs and the meters were component parts. First, the SPDs and the Delmarva meters were "integrated packages" like those discussed in *East River.* By Delmarva's own admission, "[t]he SPD Unit, the meter, and the meter box became an 'integrated unit.'" (D.I. 142 at 3.) Not only does Delmarva admit that the SPDs and the meters were integrated, they admit that the SPDs were not "stand-alone" devices that could function without the meters. (*Id.*) Thus, the two seemingly separate articles functioned as a single unit. The integration of parts

and function is persuasive evidence that compels the conclusion the SPDs and the meters were components of an integrated unit rather than separate parts. Following the Supreme Court's decision in *East River*, the court therefore concludes that the meters are not "other property" for the purposes of the economic loss doctrine. Thus, Delmarva cannot circumvent the doctrine on this basis.

In addition to the meters, Delmarva alleges that its electrical "system" was damaged. The court agrees that if portions of Delmarva's system that were not integrated with the SPDs were damaged, the resulting economic loss might be recoverable in tort. However, as Meter–Treater points out, Delmarva has presented no evidence demonstrating that any component of its electrical service system (i.e. transformers, circuits, power lines, etc.) was harmed by Meter–Treater's products. Therefore, the court rejects Delmarva's contention on this point, and will not permit Delmarva to proceed in tort on this theory.[3]

 Finally, Delmarva asserts that automobiles owned by its customers were damaged by the expelled meters. The court finds that the cars were not integrated with the SPDs or power meters, and can therefore be considered other property. However, the approximate value of the verified damage to the vehicles is $171.36. The defendant urges that this amount is small—*de minimis*—when compared to the multimillion dollar recovery sought by Delmarva.

The court is persuaded by the defendant's argument. A similar issue arose in *Rich Products Corp. v. Kemutec, Inc.* 66 F.Supp.2d 937, 971–72 (E.D.Wis.1999). In that case, wire fragments from a frayed rope manufactured by one of the defendants fell onto a conveyor belt which carried food products manufactured by the plaintiff. *Id.* at 951. The wire fragments found their way into the food product. *Id.* at 952. However, only twenty-nine wire fragments were ever found in the numerous food products. *Id.* at 952 n. 13. The plaintiff argued that even this small ratio of damage to other property was sufficient to move its case beyond the economic loss doctrine. The court disagreed, stating:

> There is no disputing that [the plaintiff] suffered damages to "other property" as a result of the alleged defect in the [rope and conveyor belt] ... [W]ire strands broke off the assemblies and contaminated food product running through the Conveyor. This food product is "other property" for purposes of the economic loss rule. The question presented by this case, however, is how much "other property" must be damaged in order to take a case outside the economic loss rule. The only evidence to date—the rope failures having occurred some five years ago—is that 29 pieces of wire found their way into RPC's food product. This is 29 pieces of wire over an 11–12 month period during which roughly 6 *million cases* of product were processed through the Appleton facility, each containing between 12 to 24 individual products. Does such a relatively small amount of damage to "other property" lift this case out of the realm of contract and into the law of tort?

*Id.* at 970–71. The *Rich Foods* court answered this question in the negative. After reviewing the law in Wisconsin, the Seventh Circuit, and several other jurisdic-

---

**3.** To the extent that Delmarva seeks to claim that its recall costs are damage to property, the court notes that such recall costs fall squarely within the quintessential definition of economic losses, and are not considered property damage. *See Danforth*, 608 A.2d at 1195 n. 3 (noting that economic losses are "damages for inadequate value, *costs of repair and replacement of the defective product*.")(emphasis in original)

tions, the court concluded that "minimal damage to 'other property' will not take a case outside the economic loss doctrine." *Id.* (citing *Miller v. U.S. Steel Corp.*, 902 F.2d 573, 576 (7th Cir.1990)) ("Incidental property damage ... will not take a commercial dispute outside the economic loss doctrine."); *Wisconsin Public Service Corp. v. Ecodyne Corp.*, 702 F.Supp. 217, 219 (E.D.Wis.,1988)("[T]he court declines to allow a tort claim upon a showing of *de minimis* damage to other property." Also citing *Florida Power & Light Co.*, 696 F.Supp. at 620 (S.D.Fla.1988)) ("[T]o permit recovery in tort where the only property damage has been minimal damage to surrounding structures and components ... would be unjustified."); *Veeder v. NC Machinery Co.*, 720 F.Supp. 847, 853 (W.D.Wash.1989) ("[I]n this case, there is only a claim for economic loss. 'Other property damage' cited by Plaintiff appears to be *de minimis* ..."); *Lewinter v. Genmar Industries, Inc.*, 26 Cal.App.4th 1214, 1223, 32 Cal.Rptr.2d 305 (Cal.App. 1994) ("[I]t would appear that the damaged items of personal property which were not part of the yacht's original inventory can only be classified as *de minimis*. It has been held that where the 'other property damage' appears to be *de minimis,* the essence of the claim is only for economic loss."); *State Farm Mutual Automobile Ins. Co. v. Ford Motor Co.*, 572 N.W.2d 321, 324 (Minn.App.1997) ("[T]o permit a tort action based on minimal damage to 'other property,' as compared to the losses incurred from the damage to the product itself, would subvert the law.").

In light of *Rich Foods,* the court finds that despite Delmarva's protestations to the contrary, persuasive precedent clearly establishes that *de minimis* property damage is not enough to bring a contract claim into the realm of tort. The court must now consider whether the property damage in this case was substantial or *de minimis*. The record reveals that the ver-ified value of the damage to the automobiles was only $171.36. This figure is less than $200 and is significantly less than one tenth of one percent of Delmarva's requested compensation of $5.4 million. The court thus finds that the value of the damage to other property in this case was *de minimis*. The *de minimis* property damage will not support recovery in tort. Therefore, Delmarva's claims remain barred by the economic loss doctrine.

For all of these reasons, the court finds that Delmarva's alleged losses do not fall into the "other property" exception to the economic loss doctrine.

### C. Recovery for "Unreasonably Dangerous" Property

■ Delmarva also asserts that it should be allowed to circumvent the economic loss doctrine because Meter–Treater's surge protection units rendered its meters or its distribution "system" unreasonably dangerous. The court disagrees.

The Restatement of Torts recognizes that there may be instances where a piece of property damages itself, and has the potential to cause harm to other property but does not actually harm other property. RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 21 (1997). In addressing this topic, the Restatement comments as follows:

A somewhat more difficult question is presented when the defect in the product renders it unreasonably dangerous, but the product does not cause harm to persons or property. In these situations the danger either (1) never eventuates in harm because the product defect is discovered before it causes harm, or (2) eventuates in harm to the product itself but not in harm to persons or other property. A plausible argument can be made that products that are dangerous rather than merely ineffectual, should be

governed by the rules governing products liability law. However, a majority of courts have concluded that the remedies provided under the Uniform Commercial Code—repair and replacement costs and, in appropriate circumstances, consequential economic loss—are sufficient. Thus, the rules of this Restatement do not apply in such situations. *Id.* at § 21, cmt. d. The Restatement thus suggests that no tort recovery can be had where the allegedly dangerous defective product has the potential to, but does not actually cause, massive injury to person or property.

The court finds that the Restatement's view is a sound one. Of course, it is proper to hold a manufacturer accountable for a dangerous product when that product actually causes harm. Conversely, it seems patently unfair to hold manufacturers liable for what *might* have happened where no damage has actually occurred. Indeed, since the *raison d'etre* of tort law is to compensate for injuries, it seems unjust and inequitable to hold manufactures responsible where no injury has yet occurred. The Restatement fairly imposes liability only upon those who cause actual harm. The court finds this view reasonable, and will follow it in the present case.

Applying the guidance provided by the Restatement, the court notes that it is quite possible that the damaged and ex-posed meters presented a danger of electrocution due to their high (and admittedly "lethal") voltage. Nevertheless, the record reveals that although such a hazardous incident (and any number of dangerous incidents) might have occurred, no such incident actually took place. Therefore, even if the Delmarva meters or systems were rendered unreasonably dangerous by Meter–Treater's SPDs, the court cannot find that they caused any injury as a result of their dangerous condition or conditions. Consequently, the damage caused to the meters or the "system" by the allegedly dangerous SPDs is barred by the economic loss doctrine and is not compensable in tort.[4]

## IV. CONCLUSION

For all of the foregoing reasons, the court concludes that Delmarva's negligence claim does not fit into any recognized exception to the economic loss doctrine. Consequently, the court concludes that Delmarva's negligence claims are barred by the doctrine. Therefore, Meter–Treater's motion will be granted. As a result, Delmarva's negligence claims will be dismissed.

NOW, THEREFORE, IT IS HEREBY ORDERED that:

1. The defendant's Objection to the Jury Instructions in Tort on the

---

4. In further support of its position on unreasonable dangerousness, Delmarva relies heavily upon cases concerning asbestos contamination. *See* D.I. 142 at 15 (citing *City of Greenville v. W.R. Grace & Co.*, 827 F.2d 975, 977–78 (4th Cir.1987); *Hebron Public School Dist. No. 13 v. United States Gypsum*, 690 F.Supp. 866, 870 (D.N.D.1988); *City of Manchester v. National Gypsum Co.*, 637 F.Supp. 646, 651–52 (D.R.I.1986); and *Town of Hooksett School Dist. v. W.R. Grace & Co.*, 617 F.Supp. 126, 131 (D.N.H.1984)). The court is not persuaded by these cases. Although the Restatement agrees that asbestos cases can be taken outside of the economic loss doctrine, the Restatement comments also indicate that asbestos cases are the exception, rather than the rule. *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 21, cmt. e. (noting that asbestos cases are the "[o]ne category of claims [that] stands apart"). For this reason, the court also rejects Delmarva's claim that its position has been (or should be) extended beyond the asbestos context. Even if Delmarva is correct that other courts have considered extending the asbestos rule, the court does not believe that the facts of this case warrant further enlargement of this very narrowly defined exception.

Economic Loss Doctrine (D.I.141) or, Partial Motion for Summary Judgment on the Economic Loss Doctrine (D.I.141) is GRANTED.

2. The plaintiff's claim of negligence as outlined in the Count IV of the complaint is DISMISSED and the plaintiff may not introduce evidence on this claim at trial.